[Filed April 19, 1887.]

STATE OF OREGON EX REL. S. C. REED, RESPONDENT, *v.* ELIJAH SMITH, C. J. SMITH, AND L. B. SEELEY, APPELLANTS. AND STATE EX REL. S. G. REED, RESPONDENT, *v.* ELIJAH SMITH, APPELLANT.

ASSIGNMENT OF STOCK. —S. being the owner of certain shares of stock assigned said shares to R. by an absolute transfer, embodying an absolute and irrevocable power of attorney, authorizing R. to transfer the stock from the name of S. to that of R. on the books of the company. The assignment was accompanied by a written agreement of the same date between the parties, providing that upon default

Points-decided.

in the payment of a note from S. to R., R. might sell or dispose of the stock upon such terms as he saw fit. Before the maturity of the note R. caused the stock to be transferred to his own name. *Held,* that the transfer and the accompanying agreement should be considered together in fixing the rights of the parties. A pledgee of stock given as security for the payment of a note, and who is authorized by the assignment to cause the stock to be transferred to his own name upon the books of the company, has no right to cause such transfer to be made before the note matures, and an attempted transfer of that nature would not divest the pledgor of his right to vote the stock.

SAME.—It is immaterial that in such cases the by-laws of the corporation limit the right of voting the stock to stockholders, and provide that transfers shall be made only on the books of the company, and that a certified transcript thereof shall be *prima facie* evidence of the right to vote.

SAME.—Where the pledgor cast the vote of such stock and it was refused by the president, who was by the by-laws the inspector of elections of directors, and the president certified to the election of other persons than those voted for by the pledgor; *held,* that the votes should be counted as cast by the pledgor, and that the persons for whom he voted were the elected directors; that the votes, when cast, and not the certificate of the inspector, constituted the election; that the election was not affected by proceedings had at the stockholders' meeting after the president of the meeting had declared the same adjourned.

TRANSFERS OF STOCK.—The owner of stock in a corporation has an untrammeled right to dispose of it, and the by-law providing that shares of stock shall be *only* transferred upon the books of the corporation is void in so far as it attempts to limit the right of the owner to transfer his stock. Such a by-law is to be construed as simply providing for proper registration of the transfer of stock for the convenience and information of officers of the corporation.

DIRECTORS.—A *bona fide* owner of shares of stock is qualified to be a director, although the transfer has not been registered on the books of the company as provided by the by-laws.

DIRECTORS, RESIDENCE OF.— Where the objects of the corporation, as expressed by the charter, are to build and construct "railroads, canals," etc., and the corporation has already done so to a limited extent, the court will not inquire into the length, extent, or magnitude of the canals or roads in order to ascertain whether a non-resident of the State is qualified to be a director of such corporation, under the statute allowing non-residents to constitute a minority of the board of directors of corporations engaged in the construction or operation of railroads, canals, etc.

BOARD OF DIRECTORS—IRREGULAR PROCEEDINGS OF.—Where a number of directors immediately after their election, which was contested and disputed by the president of the corporation, proceed in his absence, and without any notification to him—he being a member of the board—to organize and elect a president, *held,* that the proceedings were irregular and void, and were not remedied by a subsequent action of the board ratifying and confirming the irregular proceedings. (By LORD, C. J., dissenting.)

RIGHTS OF PLEDGEE OF STOCK.—Stock having been assigned by S. to R., coupled with an irrevocable power of attorney authorizing R. to transfer the shares to his own name, R. had the right so to do before default was made in the payment of the note, and R. can vote such shares as are incident of such holding while they stand in his name and the debt is unpaid.

APPEAL from Multnomah County.

Reversed in first case, and affirmed in the other.

*Williams, Ach & Wood,* for Respondent.

*Dolph, Bellinger, Mallory & Simon,* and *R. & E. B. Williams,* for Appellants.

THAYER, J. — These two cases come here upon appeal from judgments of the Circuit County for the county of Multnomah rendered in them severally. Each of them was an action at law brought in said Circuit Court in the name of the State upon the relation of S. G. Reed. The first one against Elijah Smith, C. J. Smith, and L. B. Seeley is for usurping, intruding into, and unlawfully holding the office of director in the Oregon Iron and Steel Company, and also upon the right of George H. Williams, Martin Winch, and William M. Ladd to the position. The second one, against said Elijah Smith, is for a like usurpation, intrusion into, and unlawfully holding the office of president of said company, and also upon the right of said Reed to the same. The two cases arise out of the same transaction, and the circumstances involved in them are so blended that they were heard together and may conveniently be considered together. The Circuit Court's findings of facts cover both cases, and include all the general matters relating to them. The following are said findings:—

1. That the Oregon Iron and Steel Company was organized under the general laws of Oregon on the twenty-second day of April, 1882, and among other specified objects and business for which it was organized it undertook "to purchase, acquire, hold, open," etc., "iron and coal mines," to purchase, construct, maintain, and operate blast furnaces, rolling-mills, nail-mills, saw-mills, machine shops, warehouses, ship-yards, and to engage in the manufacture of iron and steel, etc.; also, 4th, to construct, purchase, acquire, hold, own, improve, and operate canals, and to transport freight and passengers by steam or otherwise thereon. 5th. To build, equip, and operate a railroad from Oswego to Portland, Oregon, and to extend the same from Oswego to form a connection with any railroad in the Willamette Valley,

and to transport freight and passengers thereon; also to purchase, build, and operate railroads to connect its mines and other property with its furnace, rolling-mills, etc. 7th. To promote or facilitate and assist the construction, building, extension, equipment, and operation of any railroad line, steamship line, or steamboat line, and the formation of any companies for such purposes.

2. That the fifteenth day of June, 1886, was the date for the annual meeting of said corporation, and on that day the subscribed stock of the corporation was 7,501 shares, and a majority thereof was 3,751 shares, and there was represented at said meeting by the owners in person or by proxy (as appeared by the stock transfer books of the corporation) 5,701 shares, and according to said transfer and stock books S. G. Reed held in his name 3,422½ shares, and represented the same in person, and held, as proxy for George B. Clapp, 500 shares, for H. N. Arnold 100 shares, and for A. S. Reed 400 shares, making in all which said Reed apparently represented in person and by proxy 4,422½ shares of stock. That said S. G. Reed was president of said corporation and presided at said meeting, Wm. M. Ladd, vice-president, Martin Winch was secretary of said corporation, and they were both present at said meeting, and said Winch acted as secretary. Upon representations there made in effect that Elijah Smith was on his way to Portland and would probably, if the meeting was adjourned to suit his convenience, make some proposition to resuscitate and benefit the company, George A. Williams, being a stockholder present in person, moved, and it was voted to adjourn till July 1, 1886.

3. That on the first day of July, 1886, according to adjournment, the stockholders met at the place appointed, S. G. Reed, president, presiding, Martin Winch, secretary, and acting as such, and Wm. M. Ladd, vice-president, present and participating in the proceeding, and on call of stock there was 7,501 shares represented by the owners in person or by proxy, of which S. G. Reed appeared to represent in person 3,422½ shares, and Geo. B. Clapp by L. B. Seeley proxy represented 500 shares. That at said meeting, and before a vote was taken for directors, L. B. Seeley claimed to own 361 shares of stock, that stood on

the books of the company in the name of S. G. Reed, and demanded from said Reed a proxy to vote the same, which demand was answered by said Reed that said 361 shares would be voted in the usual way, and in accordance with the by-laws of the corporation, and thereupon immediately the sheriff of this county entered the room and served on said Reed an injunction issued out of this court from Department No. 2, commanding said Reed not to vote said 361 shares of said stock at said meeting, or at any adjourned meeting of said stockholders.

That Geo. H. Williams then moved an adjournment of the meeting to July 9, 1886, in order that Reed might have opportunity to apply for a discharge of the injunction which had been issued *ex parte*, and the motion was seconded and put and lost. That as to the said 361 shares of stock, the same did, prior to November 6, 1885, stand upon the stock book and transfer journal of said company in the name of L. B. Seeley; that on the twenty-seventh day of March, 1884, said Seeley assigned and delivered to said S. G. Reed said 361 shares of stock, as collateral security for the payment to said Reed of $50,000 in two years after date, with semi-annual interest at seven per cent per annum, for which sum Seeley on that day gave to Reed his promissory note. The assignment and transfer of said stock was absolute in form and embodied an absolute and irrevocable power of attorney, directing and authorizing the transferees to transfer the same from Seeley's name to that of the transferee on the books of the company; said assignment was also acccompanied by a written agreement of the same date, made by said Reed and Seeley, providing, among other things, that upon default in the payment of said $50,000 note and interest at maturity thereof, said Reed might sell or dispose of said stock at public or private sale, and in such manner and on such terms as to said Reed should seem best; said stock remained in Seeley's name on the books of the company, and were voted by Seeley till the 6th of November, 1885, when said 361 shares, on request of said Reed, were transferred on the books of said corporation to said S. G. Reed, and the certificate thereof to Seeley was canceled, and said shares have ever since stood, and do now stand, on the books of said

company in the name of said S. G. Reed. The $50,000 promissory note of said Seeley, for the security of which said 361 shares were assigned to said Reed, was due on the 30th of March, 1886, and the same was not paid, nor had the same been paid on said first day of July, 1886. That on the refusal of the meeting to adjourn, the usual business of an annual meeting was proceeded with, and among other things, it was voted to proceed to the election of directors for the ensuing year. There was then laid before the meeting by Joseph Simon, proxy for E. W. Creighton, a certificate of stock in the name of E. W. Creighton, and he stated that one share thereof had been assigned to Elijah Smith and one share to C. J. Smith, and the fact in regard to said two shares was that on or about the fifth day of June, 1886, said E. W. Creighton, for the consideration of $100 cash to him paid, had assigned one share of said stock to Elijah Smith and one share to C. J. Smith, and that within a week thereafter said Creighton sent to Martin Winch, secretary of said corporation, an informal notice of said assignment, but no transfer of said two shares, or either of them, had been made on the books of the company on the fifteenth day of June, 1886, the date of the annual meeting, nor on the first day of July, 1886, the date of said adjourned meeting, but said two shares were in fact transferred on the books of said corporation from E. W. Creighton to Elijah Smith and C. J. Smith respectively on the second day of July, 1886. At said adjourned meeting, C. R. Donohue was present and voted 87½ shares of stock in person, and also voted one share by Thos. N. Strong, proxy. E. W. Creighton was present in person, but his stock, 290½ shares, was controlled and voted by Jos. Simon, proxy. The 290½ shares so voted for E. W. Creighton included the two shares sold to Elijah and C. J. Smith aforesaid. At said meeting, Elijah Smith held a written proxy from Wm. Alvord, authorizing him as proxy to vote Alvord's 100 shares of stock at the annual meeting, and a telegram of date July 1st, confirming and extending the written proxy to all meetings during the year 1886, and the same were laid before the meeting. Geo. H. Williams objected to the stock of Wm. Alvord being voted by Elijah Smith, proxy, and also

objected to L. B. Seeley's voting the 361 shares-of stock standing in the name of S. G. Reed, and which said Reed had been enjoined from voting, and claimed that Seeley had no right to vote the said 361 shares. A vote for directors was then taken, and said 361 shares were voted by said Seeley for Elijah Smith, C. J. Smith, and L. B. Seeley, and the ballots laid before the president, said S. G. Reed, to be canvassed, and thereupon said Geo. H. Williams objected to the votes cast for Elijah Smith and L. B. Seeley being counted, because they were non-residents of this State, and also objected to the votes cast for Elijah Smith and C. J. Smith, because they were not stockholders within the meaning and intent of the by-laws, and objected to the said 361 shares voted by Seeley being counted. Said Reed, president, sustained the objection to the vote of said 361 shares by L. B. Seeley, and the vote of said 100 shares owned by Wm. Alvord and voted by Elijah Smith, proxy, and excluded the same from the count of votes. Mr. Jos. Simon, as proxy for said E. W. Creighton, appealed from the decision of the president, and the appeal was seconded, but the president refused to entertain the appeal, and proceeded to declare the result of the voting, and then and there excluded from the count of votes the said 361 shares of stock voted by L. B. Seeley, and the 100 shares voted by Elijah Smith, proxy for Wm. Alvord, and declared the result of the voting as follows, to wit: That S. G. Reed had received 7,040 votes; that W. S. Ladd had received 7,040 votes; that W. M. Ladd had received 3,563½ votes; that Geo. H. Williams had received 3,563½ votes; that Martin Winch had received 3,563½ votes; that Elijah Smith had received 3,476½ votes; that C. J. Smith had received 3,476½ votes; that L. B. Seeley had received 3,476½ votes.

And then he declared that S. G. Reed, W. S. Ladd, Geo. H. Williams, Wm. M. Ladd, and Martin Winch, having received a majority of all the legal votes cast, were duly elected directors of the Oregon Iron and Steel Company for the year ensuing, and a certificate of their election was in due form issued to said persons by said Reed, president. Geo. H. Williams, after the declaration of the vote, moved an adjournment and Martin Winch

seconded it, and the president put the question to vote *viva voce*, and there was a sound of ayes and a sound of noes, but no call was made for a recorded vote by ayes and noes, nor for a division and special count of votes. Whereupon the president declared the meeting adjourned. The fact was, however, there were seven persons representing a majority of the stock voting, who voted against adjournment, and four persons representing a minority of the stock voting, who voted for the adjournment. On announcing the vote and declaring the meeting adjourned, the president, with Geo. H. Williams and the secretary, Martin Winch, withdrew from the meeting, but before said Winch, secretary, had passed out of the room, the record book of the corporation, in which were recorded the minutes of stockholders' meetings, along with a part of the ballots for directors and several other papers and documents belonging to the secretary's office, were taken from him by force by L. B. Seeley. After the president, secretary, and said Geo. H. Williams had so retired from the room, the persons remaining, among whom was Wm. M. Ladd, vice-president of the corporation, proceeded to choose W. S. Ladd, chairman, and Wm. M. Ladd, secretary, and proceeded to declare what they claimed to be the true result of the above-described vote cast for directors, and as data for the same referred to tally lists kept by some of the stockholders when Reed was canvassing the vote, and to memoranda left by Winch, as well as the recollection of the stockholders present, and said persons then by vote ordered that the 361 shares voted by L. B. Seeley and the 100 shares voted by Elijah Smith, proxy, for Alvord should be counted. Said 361 shares and said 100 shares had been voted for Elijah Smith, C. J. Smith, and L. B. Seeley for directors, and the same were now counted for said parties, and said W. S. Ladd, chairman, proceeded to declare the vote as follows, to wit: That S. G. Reed had received 7,501 votes; that W. S. Ladd had received 7,501 votes; that Elijah Smith had received 3,937½ votes; that C. J. Smith had received 3,937½ votes; that L. B. Seeley had received 3,937½ votes; that Geo. H. Williams had received 3,563½ votes; that Martin Winch had received 3,563½ votes; that Wm. M. Ladd had received 3,563½ votes.

. And said W. S. Ladd, chairman, then declared that S. G. Reed, W. S. Ladd, Elijah Smith, C. J. Smith, and L. B. Seeley were elected directors for the ensuing year, and said chairman thereupon executed and issued to said persons a certificate of their election.

4. That Elijah Smith, C. J. Smith, L. B. Seeley, and W. S. Ladd, claiming to be directors of the Oregon Iron and Steel Company, by virtue of election as aforesaid, July 1, 1886, took the oath required by law to qualify directors of such corporations to act in such capacity, and on the same day, without notice to S. G. Reed, proceeded at a special meeting to organize said board of directors by choosing Elijah Smith for president, Wm. S. Ladd, vice-president, and Wm. M. Ladd, secretary, and at a regular meeting of said board, held on Tuesday, August 17, 1886, the proceedings of the said meeting of directors, held on July 1, 1886, was by vote and in form ratified, confirmed, and approved.

5. That on the sixth day of July, 1886, S. G. Reed, George H. Williams, and Martin Winch, claiming to have been elected directors of the Oregon Iron and Steel Company at the meeting of stockholders held July 1, 1886, as above described, in due form took the oath required to qualify directors of such corporations to act as such, and on the same day due notice thereof having been given to W. S. Ladd and Wm. M. Ladd, held a special meeting of said board of directors and elected S. G. Reed, president, George H. Williams, vice-president, and Martin Winch, secretary, for the ensuing year.

6. That Elijah Smith and L. B. Seeley were, on July 1, 1886, and still are non-residents of this State, and they and C. J. Smith are claiming and assuming to act as directors of said corporation, and said Elijah Smith is claiming and assuming to act as president of said corporation.

7. That if the 361 shares of stock standing on the books of the company in the name of S. G. Reed and claimed by L. B. Seeley, and voted by him, be excluded from the count of votes, the number of votes cast at said meeting for Elijah Smith, C. J. Smith, and L. B. Seeley, respectively, would be $3,576\frac{1}{2}$ for each,

which is 174½ votes less than a majority of all the stock of the company.

8. That said Oregon Iron and Steel Company holds by purchase and operates a short narrow gauge railroad, from its furnace to its mine, about three miles in length. That it owns a short canal projected from Tualatin River to Sucker Lake, and has spent in and about the improvement of the Tualatin River so as to make said canal useful and in getting right of way and of flowage, and the like, about $10,000, but said canal is not now navigable for boats, and the said company has run a preliminary survey to extend said road to their timber lands in Washington County, a few miles distant, and proposed, in case of the extension and construction of said railroad and the improvement of said canal and river, to do a general transportation business on said lines.

That Elijah Smith and C. J. Smith submitted to the stockholders' meeting, held July 1, 1886, a certificate of stock in the Oregon Iron and Steel Company, issued to E. W. Creighton for 290½ shares of the capital stock of said company, upon which certificate was indorsed an assignment and transfer of one share of said stock to Elijah Smith and one share to C. J. Smith each, under date of June 5, 1886, and said Elijah Smith and C. J. Smith, at stockholders' meeting, upon exhibiting said certificate and assignment, claimed by virtue thereof that they were stockholders of said Oregon Iron and Steel Company.

From these findings of fact the said court found the following conclusions of law : —

1. That L. B. Seeley was not a stockholder in the Oregon Iron and Steel Company as to the 361 shares of stock claimed by him and standing in the name of S. G. Reed, and was not entitled to vote said shares on the fifteenth day of June, 1886, nor on the first day of July, 1886, and said 361 shares were not entitled to be counted, when offered and cast by said L. B. Seeley.

2. That said Elijah Smith, C. J. Smith, and L. B. Seeley, not having either of them received a majority of the legal vote of the shares of the stock of said corporation, after rejecting from the count said 361 shares cast by L. B. Seeley and standing on

the books of the company in the name of S. G. Reed, were not elected directors of said Oregon Iron and Steel Company, and are unlawfully assuming to act as such.

3. That the proceedings of the assembly of persons on the first day of July, 1886, described in the pleadings and findings of facts herein, whereof W. S. Ladd was chosen chairman, and at which a count of the votes of the stockholders of said corporation was claimed to have been made, and Elijah Smith, C. J. Smith, and L. B. Seeley were declared and elected directors of said corporation, were irregular, contrary to law, and are without force or validity.

4. That the canvass of votes by said W. S. Ladd, chairman, and the certificates of election of directors of said corporation, issued by said W. S. Ladd, chairman, were and are void and of no force or effect in law.

5. That Elijah Smith and C. J. Smith were not, nor was either of them, on said first day of July, 1886, a stockholder in the Oregon Iron and Steel Company, and neither of them was eligible to the office of director.

6. That the vote of 100 shares of stock owned by Wm. Alvord and represented by Elijah Smith, proxy, at said meeting, on July 1, 1886, was entitled to be counted, and was by said Reed unlawfully rejected.

7. That the alleged meeting of July 1, 1886, at which it is claimed Elijah Smith was chosen president of the Oregon Iron and Steel Compay, was irregular and without authority of law.

8. That defendants Elijah Smith, C. J. Smith, and L. B. Seeley have each of them usurped, intruded into, and are unlawfully holding and exercising the office of directors in the Oregon Iron and Steel Company, and the plaintiff is entitled to judgment; that they and each of them be excluded from said office.

9. That Elijah Smith, defendant, has usurped, intruded into, and unlawfully holds and exercises the office of president of the Oregon Iron and Steel Company, and the plaintiff is entitled to judgment; that he be excluded from said office.

The general question to be determined here is whether the conclusions of law are warranted by the facts, and if they are not,

then what deductions should be drawn from the facts, and the effect thereof upon the final result reached by the Circuit Court. There seems to have been an active rivalry between two sets of the parties interested in the enterprise which the corporation was organized to promote, and a considerable effort made to employ sharp practice by the respective opponents. It has resulted in a complication of the affairs of the corporation which the courts must undertake to untangle, and which presents several important and difficult questions to solve. The conclusions of law, as found by the Circuit Court as a whole, cannot, in my opinion, be sustained. I think Seeley was a stockholder as to the 361 shares of stock referred to in said first finding, and had a right to vote them on the dates therein mentioned. His assignment to Reed of said shares of stock under the circumstances and for the purposes shown by the evidence amounted only to a pledge. The agreement executed by Reed back to Seeley at the time the assignment was made clearly shows it. The transaction took place on the twenty-seventh day of March, 1884. The agreement recites that Reed was about to loan or advance to the Oregon Iron and Steel Company a certain amount of money, so that the total amount of his loan or advances to said company, including the amount theretofore loaned or advanced by him, should aggregate the sum of $150,000, and that Seeley was willing to obtain a third interest in the said total, and had given his note of that date to Reed for the sum of $50,000, payable two years from date with seven per cent interest, and had delivered as collateral security for said note and interest the 361 shares of stock. Therefore Reed undertook and agreed, upon the full payment of the note and interest, to redeliver to Seeley said shares of stock, etc., in consideration of which Seeley authorized and empowered Reed, upon default of the payment of said note at the maturity thereof, with the interest thereon, to sell or dispose of at public or private sale, and in such manner and upon such terms as to the said Reed should seem best, the said stock, etc. The terms of the assignment were absolute, and empowered Reed to transfer upon the books of the company the shares of stock, but did not change the character of the transaction. In Edwards

on Bailments, section 219, the author says: "Shares of stock in a corporation are now, and have been for many years, habitually pledged as collateral security for money loaned. The pledge is made by a direct transfer of the scrip in writing, with an authority to effect a transfer in due form on the books of the corporation; and in his note for the sum loaned the borrower further authorizes the pledgee to sell the stock. The effect of the transaction is not a mortgage, but a pledge of the stock to secure the prompt payment of the money borrowed. On account of its incorporeal nature, property in stock cannot be otherwise delivered. The delivery of the scrip alone is not considered sufficient, because it does not of itself enable the pledgee to sell the stock and apply the proceeds to pay the debt. . . . . The contract of pledge is entirely consistent with the owner's right as a stockholder. Until the pledge is rendered available by a foreclosure he remains a member of the corporate body, interested it its management." It cannot be maintained, I am satisfied, that the transaction amounted to anything more than a pledge, or authorized Reed to use, employ, or dispose of the shares of stock except in default of the payment of the note at its maturity, and then only by a public or private sale, and transfer of them upon the books of the company. The discussion at the hearing was quite earnest as to the necessity and effect of a transfer of shares of stock upon the company's books, the one side claiming that an assignment alone could only operate to transfer an equitable title; the other, that it transferred, in the language of section 14, chapter 7, Miscellaneous Laws, "all rights of the original holder, or person from whom the same is purchased." This point has been a source of a great deal of controversy in the courts, and attempts in many of the States have been made to settle it by legislative enactment. The State of New York, by an act passed more than sixty years ago, provided that, "in all cases where the right of voting upon any share or shares of stock of any incorporated company of that State should be questioned, it should be the duty of the inspectors of the elections to require the transfer books of said company as evidence of stock held; and all such shares as might appear standing thereon in the name of any person or

persons should be voted on by such person or persons, directly by themselves or by proxy, subject to the provisions of the act of incorporation." Another provision was also made at about the same time as the former, providing that it should be the duty of the Supreme Court, upon the application of any person aggrieved by or complaining of any election, or any proceeding, act, or matter in, or touching the same, to proceed forthwith, and in a summary way to hear the affidavits, proofs, and allegations of the parties, or otherwise inquire into the matter or cause of complaint, and thereupon to establish the election so complained of, or to order a new election, or make such order, or give such relief in the premises as right and justice might appear to the court to require. Under these two statutes it has been held by the courts of that State that the inspectors of such elections should be bound by the transfer book; but that, as errors might creep into the transfer book, it was deemed expedient to provide a mode of correcting the result of such errors. To that end the court was vested with ample power to inquire into the cause of complaint on motion, and to give relief by ordering a new election, or otherwise, as right and justice should require. (*Strong* v. *Smith,* 22 Sup. Ct. Rep. 234.) How said courts would have held as to such inspectors being bound by the transfer book upon a question of qualification as a voter in the absence of the statute can only be a matter of conjecture. In California, there is a statute which provides that no transfer of stock shall be valid, except between the parties thereto, until the same shall have been so entered upon the books of the company as to show the names of the parties by and to whom transferred, the number and designation of the shares, and the date of the transfer. Under that statute it is held by the courts of that State that a transfer of stock until entered upon the books of the company confers on the transferee, as between himself and the company, no right beyond that of having such transfer properly entered. (*People* v. *Robinson,* 64 Cal. 375.) It was, however, held in a former case that a surviving partner had a right to vote shares of stock belonging to the partnership, although standing upon the books of the corporation in the name of the deceased partner. Cope, J., in delivering the

opinion of the court, said : " We think that no consequence is to be attached to the circumstance that a portion of the stock represented by Hill stood upon the books of the corporation in the name of Devane alone.   This was *prima facie* evidence that it belonged to the separate estate of Devane, but it was competent for the defendant to show that it was in fact the property of the partnership.   The cases cited from New York proceed entirely upon a statute of that State, and the reasoning in some of the cases indicates very clearly that in the absence of the statute the conclusions would have been different.   We are unable to perceive that the other authorities referred to have any bearing upon the case.   It would seem, upon principle, that the real owner of stock should be entitled to represent it at the meeting of the corporation, and the mere fact that he does not appear as owner upon the books of the company should not exclude him from the privilege of doing so."   (*Allen* v. *Hill,* 16 Cal. 119.)   The authority of this case does not seem to be questioned in the latter one; and from the two we may, I think, conclude that the real owner of the stock is entitled to represent it, in the absence of express law interfering with the right.   In view of the New York statute referred to, "that shares of stock standing upon the books of the corporation in the name of a person or persons shall be voted on by such person or persons, directly by themselves or by proxy, subject to the provisions of the act of incorporation," we cannot expect much aid from the decisions of the courts of that State in construing the laws of this State upon the subject.   And we are equally unfortunate in regard to the decisions of the California courts respecting the rights of transferees of stock before any transfer is entered upon the books of the corporation, as the statute of that State, which has been referred to, declares in express terms the effect of such transfer. We are also in the same situation, so far as I have been able to observe, with reference to most of the decisions that have been cited by counsel herein.   They have generally been made under some statute that controlled them.   The decision of a court of another State, when made under a statute similar in its provisions to our own, is entitled to consideration; but when it merely

undertakes to construe a different one, it does not aid us in interpreting ours. We have a statute which requires private corporations to keep a stock book in such manner as to show intelligibly the original stockholders, their respective shares, the amount paid, and the amount due thereon, if any, and all transfers thereof, which stock book, etc., shall be subject to the inspection at all reasonable hours by any person interested therein and applying therefor. (Misc. Laws, § 12, ch. 7.) But it wholly fails to declare the effect of a neglect to enter such transfer upon such stock book, or of the extent of the right of a purchaser from a holder, except as provided in said section 14 of said chapter, as before mentioned — "the rights of the original holder or person for whom the same is purchased." It seems to me that under the statutes of this State no such consequences attach on account of a neglect to have a transfer of stock entered upon the books of the corporation, as has been held by the courts of many of the other States, and that such holding has resulted from the peculiar provisions of the statutes of those States, or of the articles of incorporation of the companies, or by-laws authorized by statute. I believe that it was the intention of the legislative assembly of this State to permit a stockholder to sell his stock to whoever he might see fit, and that the purchaser should succeed to all his rights, both equitable and legal. Certain relations exist, it is true, between corporations and their stockholders which are the subject of regulation. There are mutual obligations upon the part of the respective parties, and in order to maintain them and promote the interest of all, the corporations are empowered to make reasonable by-laws for the conduct of their affairs. This power under the statute extends to the making of by-laws, not inconsistent with existing law, for the transfer of the stock of the corporation. (Misc. Laws, subd. 6, § 5, ch. 7.) The by-laws so made have no force, however, except to regulate the relations referred to; they merely prescribe rules to be observed in the performance of acts which the members are, by tacit obligation to the body politic, required to perform. Any exaction beyond this is an absolute nullity. In the case under consideration, Mr. Seeley had a right to pledge to Mr. Reed the 361 shares

XV. OR.—8.

of stock and retain the general ownership of it, and it was not in the power of the latter or of the corporation to deprive the former of any right arising out of such ownership without his consent.   Mr. Reed's authority over the shares of stock was specified in the written document before referred to, and any attempt upon his part to exercise authority not therein conferred was an usurpation.   It appears that Mr. Reed, without selling the stock under the power given him, and without waiting for the event to transpire which authorized him to sell it, had it transferred on the books of the company to himself.   He had no more right to do that than he would have had to forcibly take the stock from Seeley's possession, and have it transferred to himself upon the books; and any countenance given to the transaction by the company made it a joint wrong-doer with him. The company had no power to sanction the act or view it in any other light than a wrong.   The fact that the stock was transferred upon the books to Reed and stood in his name, unless done by consent of parties or in pursuance of lawful authority, clothed him with no rights in reference to it, nor deprived Seeley of any; nor did Reed's ruling, as president of the stockholders' meeting, .that Seeley was not entitled to vote on said shares of stock, affect the question.   The latter's right to so vote was derived from the 'law and not from Mr. Reed.   He did vote, and his vote should 'be-deemed counted.   Elijah Smith, C. J. Smith, and L. B. Seeley received at that meeting a majority of the legal votes of the shares of stock of the corporation.   The findings that the proceedings had on the first day of July, 1886, by the assembly of persons whereof W. S. Ladd was chosen chairman, were irregular, contrary to law, and without force or validity; that the canvass of votes by W. S. Ladd, chairman, and the certificates of election issued by him as chairman, were void and of no force or effect in law, may, in one sense, be correct.   The proceedings were certainly irregular, and there was a reason for it.   Mr. Reed attempted to adjourn the meeting, evidently against the consent of a majority of the holders of stock represented in person and by proxy, and he and others left before the business was done. He had, before leaving, attempted to exclude the vote on the said

361 shares of stock, had declared himself and friends elected directors when they had not received a majority vote of the stock, and declared the meeting adjourned.   Such conduct was not calculated to incite order and regularity.   It was a sort of *coup d'etat* movement, which he probably felt justified in resorting to in order to counteract a similar one on the part of his opponents. This left the meeting, no doubt, in a confused condition.   It however reorganized by choosing Mr. W. S. Ladd, chairman, and the proceedings referred to were had, and whether the emergency authorized it or not, did not affect the legality of the election that had taken place before it occurred.   The vote had then been taken and the question decided.   As was said by one of the counsel for the respondent in an election contest case, while occupying a seat upon this bench, "whoever has received a majority of the legal votes cast is as much elected at the closing of the polls as he possibly can be by means of that election. The choice of the voters has become a perfect fixed fact.   To make proof of that fact is all that remains to be done."   (*Day* v. *Kent*, 1 Or. 129.)   In the condition in which the meeting was left, after the president withdrew, it was doubtless embarrassing to know how to proceed or what to do.   The members had a right to ascertain for their own benefit whether the result of the vote, as declared by the president, was correct or not; and if their action in the premises was entirely unofficial, I cannot see how it affects the case.   Mr. Reed could not, by any erroneous ruling as canvasser of the votes, defeat any of the candidates.   The will of the voter could not be thwarted in that way.   This court would not certainly oust a person from the possession of an office who had received a majority of the legal votes cast for the office, because the canvasser had erroneously decided that certain of the votes cast for the officer were illegal, and had wrongfully excluded them, nor would attempt to do it because parties interested in the election had undertaken to act as canvassers and issue certificates of election where they had no authority to do so.   The only question the court would attempt to determine would be, who received the requisite number of votes entitling him to the office. Under the view taken as to the right of Seeley to vote the 361

shares of stock pledged to Mr. Reed, Mr. W. S. Ladd, Elijah
Smith, C. J. Smith, and L. B. Seeley severally received a major-
ity of the votes on all the shares of stock of the corporation for
the office of director; but whether they were all entitled to such
office or not depends upon other questions that have been pre-
sented for our consideration.

*Residence of directors.* One of the questions is, that the cor-
poration does not come within that class of corporations that can
permit a minority of the board of directors to reside out of the
State, and that as Elijah Smith and L. B. Seeley were non-resi-
dents of the State at the time of the election, they were ineligible.
From an inspection of the articles of incorporation, it will be seen
that they include objects the corporation was authorized to carry
out, which come within the proviso of the statute allowing a
minority of non-resident directors; and we think the evidence
tends to show that the corporation may be included in the class
referred to. The reasons for adopting the said proviso do not
appear from anything contained in the statute, and I doubt
whether the extent of business the corporation was engaged in,
or expected to engage in, was the ground for adopting it. It
applies to corporations " constructing railroads or military wagon
roads, canals or flumes, or publishing newspapers or conducting
·institutions of learning." They may be enterprises of great
extent or very limited. I do not see that the legislature had in
view organizations engaged in general business any more than
those engaged in local matters. If it did it should have so indi-
cated. The court could hardly be expected to determine the
lengths the road should be, or size of the canal or flume, in order
to decide whether the corporation constructing it had the right
to permit the minority of its board of directors to reside out of
the State. I do not see that the court can do more than decide
whether the corporation comes within the character of organiza-
tions allowed the privilege referred to, and it seems to me that
this one does.

*Directors must be stockholders.* Another of the questions raised
by the respondent's counsel is as to the qualification of Elijah
Smith and C. J. Smith to be directors. They contend that the

Smiths were not stockholders of the said corporation at the time of the election mentioned, there having been no transfer of the stock held by them made upon the company's books.    Section 4, article 6, of the by-laws of the corporation provides that: "Transfer of stock shall be made *only* upon the books of the company by the holders in person or by power of attorney, duly executed and filed with the secretary of the company, and on the surrender of the certificate or certificates of such shares."    Section 7, same article, provides that the secretary shall keep a transfer book, in which he shall register all transfers of stock, etc., and that such transfer book shall be closed for ten days previous to, and on the day of the annual meeting of the stockholders.    These by-laws have no effect whatever upon the property rights of the stockholder; nor do they restrict his right to transfer his stock at pleasure, subject to the charter rights of the corporation.    By-laws, as before suggested, have no force except as a regulation of the intercourse between the stockholder and the company.    They are restrictions, as said by Beck, J., in *Farmers' and Merchants' Bank of Linnville* v. *Wasson*, 48 Iowa, 339, "intended for the benefit of the corporation, when its rights may be protected thereby."    Such a restriction as that contained in section 4 "is necessary in order that the officers of the corporation may know who are stockholders, which is essential in conducting elections of officers, and for other matters.    It can never defeat the rights of other parties, and in all cases must be regarded as a reasonable requirement. . . . . If the corporation has no rights to be protected by its exercise, and other parties would be deprived of their property thereby, it cannot be enforced in such cases.    Its enforcement would operate as an infringement upon the property rights of others, which the law will not permit."    The same view is expressed in *Seeligson & Co.* v. *Brown*, 61 Tex. 114, and in Angell & Ames on Corporations, section 357.    The respondent's counsel, according to my notion, fell into an error in regard to by-laws of a corporation affecting property rights in the stock thereof.    They insisted that a party might be a "stock owner" and not be technically a "stockholder," and that a purchaser of shares of stock from the holder, when not transferred upon the

books of the company, could not vote the stock at corporation elections, or claim dividends accrued thereon, because he was not strictly a stockholder. This, as I view it, is a mistake. Such purchaser is both owner and holder of the stock, and would be so recognized everywhere except in conducting affairs with the company. The latter might very properly claim and establish that it would recognize no one as a stockholder until a transfer of the stock was made upon its books. In the case at bar the Smiths appeared at the stockholders' meeting with a regular assignment of a share of stock to each from a former holder, but without the same having been transferred upon the books of the company. That would ordinarily have been sufficient proof that they were stockholders, but not so with their dealings with the company. Its by-laws provided that the "transfer should be made only upon the books of the company by the holder in person"; and it had the right to ignore their claims to vote on the stock, or to receive dividends that might be due thereon. The corporation, through its board of directors, made the rule for its own benefit. It convenienced its officers in enabling them to know from an inspection of the company's books who were its stockholders, and entitled to enjoy the privileges and franchises it conferred; and it tended to avoid disputes and controversies regarding a transfer of its stock. I have no doubt but that a stockholder's right to vote on stock claimed to have been purchased, but not so transferred upon the books, or to demand dividends thereon, could be successfully challenged upon that ground alone. This, however, is the only purpose it could serve. I consider the regulation a reasonable one where the law upon the subject is reasonably construed. The Smiths stood very differently in relation to the two shares of stock from what Seeley did with reference to the 361 shares pledged to Reed. The latter was on the books in Seeley's name until the attempt was made to transfer it to Reed. The former was on the books in the name of another party, and no transfer made as provided by the by-law. Negligence might be imputed to the Smiths in not having had their shares of stock transferred to them upon the books; but it could not be charged against Seeley, he not having author-

ized it, nor being a party to it.  I do not think the former would
have had the right to vote upon their share of stock if they had
desired to do so.  But did this render them ineligible to be
elected directors of the corporation?  This is the most difficult
question to my mind in the whole case.  They were not shown
to be stockholders by the books of the company, though they
were such in fact, and the representative of a majority of the
shares voted in favor of their election.  The by-laws are silent
in regard to the consequences of not having the transfer made
upon the books, and the power to adopt them in the absence of
express statutory authority cannot, in any case, be extended
further than necessary to the protection of corporate rights.  It
cannot be maintained that section 4 of article 6 of the by-laws
referred to has the force of a legislative enactment, or in view
of the statute upon the subject, that a transfer of stock can be
made only upon the books of the company.  The statute pro-
vides that "the stocks in all private corporations organized under
chapter 7, Miscellaneous Laws, are to be deemed personal prop-
erty, and subject to attachment, execution, levy, and sale, as such;
and the corporation, in case of such sale, is required to make the
necessary transfer to the purchaser upon the stock book." (§ 13
of said chapter.)  If such stock is personal property, subject to
attachment, execution, levy, and sale as such, the holder certainly
is entitled to make a voluntary sale of it without authority from
the statute; but if such authority were required, section 14 of
said chapter, impliedly, at least, gives it; and it will hardly be
contended that a sale does not generally operate to transfer prop-
erty from the vendor to the purchaser, and the same rule applies,
in my opinion, to the sale of stock, whether transferred upon the
stock book or not.  I cannot see that the latter, as expressed in
the statute, amounts to anything more than a registration of the
transaction.  The sale is made by the seller to the buyer.  The
corporation has nothing to do with it except to make the neces-
sary entry upon the stock book, showing the fact, and as before
suggested, that is evidently required for the convenience of the
officers of the company in the management of its affairs.  If a
purchaser of stock were to neglect to have the transfer made upon

the stock book, his dividends could be withheld, or paid to the former holder, perhaps, and should he offer to vote on the stock at a stockholders' meeting, his vote could be refused. Under the statutes of this State, I do not believe that the corporation in question had any authority to adopt a by-law limiting the right to transfer stock, as the one in question attempted to do, or that it can be construed to have any more force or effect than I have indicated. If the stockholders at the meeting referred to had refused to recognize the Smiths as stockholders, for the reason mentioned, the latter could not have justly complained, but a majority of the stockholders did not. On the contrary, they voted for their election as directors of the company. Must this court then say, as a matter of law, that they were ineligible, and that they unlawfully intruded into the office of director? In a case in 44 New Jersey Law Reports, p. 529, entitled *In re the Election of Directors of the St. Lawrence Steamboat Co.*, Depue, J., in delivering the opinion of the court, said: "The general rule is, that the books of a corporation are the evidence of the persons who are entitled to the rights and privileges of stockholders in the management of the affairs of the corporation, . . . . the books of the corporation are the only evidence of who are the stockholders, and as such are entitled to vote at elections. Neither the inspector nor other stockholder can dispute the right to vote of one who appears by the company's books to be the holder of stock legally issued. . . . . But with respect to the qualifications of a director, the company's books are not conclusive. A person may be qualified to be a director whose vote cannot be received at the election. He may be a *bona fide* holder of stock at that time, and yet be disqualified from voting on it by reason of the transfer not being entered on the books. He may appear as a stockholder on the books and still, for reasons *aliunde*, be disqualified for the office of the director. The question of the competency of a person for the directorship is one exclusively of judicial cognizance, over which the inspectors of the election have no jurisdiction. They have no means of making the necessary investigation on the subject, and no power to reject a competent vote because cast for a person who, in their judgment, is

disqualified for the office. . . . . The question of eligibility is one that can be raised only in the courts. Independently of the statute, a person might be a director of a corporation without being a stockholder. The statute is guardedly expressed. It prescribes as the qualification of a director, that he shall be a *bona fide* holder of stock. A stockholder may have purchased stock with a view of·becoming a director, or have obtained it by gift, or he may hold it upon a trust, and be qualified to be a director. If the stock was legally issued, and is not the property of the corporation, and the legal title is in him, he is *prima facie* capable of being a director, and his right to be a director in virtue of his legal title to such stock can be impeached only by·showing that title was put in him colorably, with a view to qualify him to be a director for some dishonest purpose, etc. If the conclusions of the learned judge are correct, they are decisive of the question under consideration, although the view expressed may not be in every respect in harmony with our own. But the main point in the question is whether the Smiths were stockholders within the meaning of the section of our statute, which provides that no person is eligible to the office of director unless he is a stockholder in the corporation." (§ 8 of said chapter 7.) I am inclined to the belief that in view of the various provisions of the statute, and in the absence of any qualification of the right acquired by general purchase, they were. If the opposite view were to obtain, cases would be likely to arise that would present a strange anomaly. If a majority of all the stock of this corporation had, on the day of the election, stood in the name of Elijah Smith, and five or six days previous thereto it had been sold regularly upon execution, and Mr. Reed had purchased it, still Smith could have gone into the stockholders' meeting and elected himself and friends directors, although he did not legally own a cent's worth of stock at the time. It seems to me that the right to vote the shares of stock under such circumstances would be carrying the doctrine far enough without extending it to the right to elect a person director whose only title to stock was the fact that the entry of the transfer on the stock book had not been made. That would be carrying fiction, in my judgment, to

an unreasonable extent. It would, indeed, be a sacrifice of substance to name. This disposes of the case as against the directors. The judgment against Elijah Smith for intruding into the office of president of the board of directors, I am inclined to think, should not be interfered with. The attempt upon the part of the directors, chosen under the circumstances he and his friends were, to hold a special meeting at once, without any notice to Mr. Reed, and elect officers, exhibited an indecent haste, and was irregular; nor do I think the irregularity was cured by the attempt at the subsequent meeting to ratify and confirm the proceedings of the previous one. I do not think such proceedings would be any more regular when ratified and confirmed than they were originally. The best way to legalize them is to begin over again and transact them properly. The special meeting, so called, was unauthorized, and the proceedings had thereat were a nullity, and not capable of ratification or confirmation. The result is that Elijah Smith was not president *de jure* of the board of directors. The judgment in the action against Elijah Smith, C. J. Smith, and L. B. Seeley will be reversed and the complaint dismissed, and the judgment in the action against Elijah Smith will be affirmed; costs in each case to be taxed in favor of the prevailing party.

Upon petition for rehearing.

THAYER, J.—I have examined with some care the ably-prepared petition for rehearing filed herein by the counsel for the respondent, and have endeavored to give it that consideration which the importance of the questions involved therein demand. The counsel inquire with considerable earnestness whether any one can imagine any reason for the giving of the written power of attorney by Seeley to Reed, at the time the stock was transferred by the former to the latter, excepting that it was understood and intended that Reed should transfer the stock as provided for in the power of attorney. Another inquiry might be made that would be as difficult to answer, and that is, why Seeley executed to Reed an absolute transfer and assignment of the stock, when it was understood and intended by

them that no title to the stock was to pass from the former to the latter, beyond a right to sell it in case of a default in the payment of the $50,000 note, and an application of the proceeds to such payment. The assignment and delivery of the 361 shares of stock, and execution of the power of attorney by Seeley to Reed, no more expresses their intention in the transaction than an absolute deed to real property from the former to the latter would, where a defeasance was given back. The deed by itself would constitute a complete conveyance of the property, but in connection with the defeasance, would be no conveyance at all; would be no more than a charge or lien upon the property. So the assignment and power of attorney, considered by themselves, would constitute a sale of the stock, with an immediate right upon the part of the purchaser to have a transfer made, from the vendor to himself, on the books of the company; but, considered in connection with the agreement made and entered into by and between the parties at the same time, might have an entirely different character. It is certain that the assignment was not intended to have any effect except as a pledge of the stock, coupled with a right to sell it in case the note was not paid at its maturity; and I concluded, when the case was heard, that the power of attorney could have no operation until such sale were made; that it was only executed for the purpose of enforcing the security in case Reed was compelled to resort to it in order to obtain payment of the note; and I therefore characterized Reed's act in having the transfer made to himself upon the books of the company, by surrendering up the stock, and having new certificates issued to himself before the note became payable as a wrong. Whether that conclusion was correct or not must be determined by an ascertainment of the intention of the parties to the transaction, and that must be gathered from the assignment and transfer of the stock, the power of attorney, and the agreement entered into between them at the time. The said agreement contains a recital that Reed was about to advance to "the Oregon Iron and Steel Company" an amount of money, so that the total amount of his advances would aggregate $150,000; that Seeley was willing to take an

interest of $50,000 in the total advances made by Reed, and had given his note, of even date with the agreement, to Reed for said sum, payable two years from date, with interest, etc., and had delivered as collateral security for said note and interest, 361 shares of the capital stock, full paid, of said company.   Therefore Reed undertook, upon the full payment of the note and interest, to redeliver to Seeley said shares of stock, together with one third of such bonds, etc., as he should receive from said company, in consideration of his said advances; and Seeley, in consideration thereof, authorized and empowered Reed, upon default of the payment of said note at the maturity thereof, together with the accumulated interest thereon, to sell or dispose of, at public or private sale, and in such a manner and on such terms as to the said Reed would seem best, the said 361 shares of stock.   Any one having any knowledge whatever of business affairs would know at once that this agreement was the substratum of the transaction between the parties, and that the assignment and transfer of the stock, and execution of the power of attorney, which it appears was signed in blank, were for the sole purpose of carrying out the provisions of the agreement, and it seems to me that, to term this assignment and transfer of the stock anything other or different than a pledge, would be a misnomer. It is well understood that such character of property is capable of being pledged as well as sold, and that the general law relating to that subject applies to such a pledge.   Reed's duty in the matter, under the law and under the agreement was, upon full payment of the note and interest, to redeliver to Seeley the 361 shares of stock; no authority was given him in the agreement to surrender them to the company, and receive other certificates in his own name.   He could not become the owner of the stock by a transfer to himself, and no more, in my opinion, had he the right to clothe himself with the apparent ownership of it.   He had authority to sell it, in case the note and interest were not paid when due, and make a transfer to the purchaser upon the books of the company.   The power to make such transfer, it seems to me, was only to complete the sale, in case the event transpired authorizing him to make the sale.   Counsel, how-

ever, claim that it was necessary in order to protect his security, that the transfer upon the books be made to him at once; that otherwise Seeley's creditors might come forward and attach the stock and cut off the security. They do not explain how Seeley was to be protected against Reed's creditors, in case the stock is registered in the latter's name. I do not see how Seeley, especially under the view of counsel, that the registry of the stock passes the legal title, could have any protection. Reed would have the title, and his creditors, if he had any, could sequester it with impunity. It would not be necessary for them to prove that they trusted him upon the faith that he was the owner of the stock, as he would be owner in fact. But I do not think that, "unless Reed had the right to transfer the stock to himself upon the books of the company under said power of attorney, his collateral security would be of any more value to him than a chattel mortgage unrecorded, and concealed in his pocket;" or that, "prior to the time when the transfer was made upon the books of the company, any creditor of Seeley might have attached the stock, or have seized it upon execution, or Seeley might have sold it to a *bona fide* purchaser." There have been, I confess, a number of decisions to that effect, but the weight of authority is the other way. Mr. Cook of the New York bar, in a late work on the Law of Stock and Stockholders, says (§ 487): "The decided weight of authority holds, that he who purchases for a valuable consideration, a certificate of stock, is protected in his ownership of the stock, and is not affected by a subsequent attachment or execution levied on such stock, for the debts of the registered stockholder, even though such purchaser has neglected to have his transfer registered on the corporate books, thereby allowing his transferror to appear to be the owner of the stock upon which the attachment or execution is levied." And this author cites a large number of authorities in support of that rule.

The decisions upon the question in the different States, and in many of the States themselves, have not been in harmony. The language of Chief Justice Shaw, in *Fisher* v. *Essex Bank*, 71 Mass. 373, quoted in the counsel's petition, "that shares in a

bank whose charter provides that they shall be transferable only at its banking-house, and on its books, cannot be effectually transferred, as against a creditor of the vendor who attaches them without notice of the transfer, by a delivery of the certificates, together with an assignment and blank power of attorney from the vendor to the vendee, even if notice of the transfer be given to the bank before the attachment," instead of being authority in favor of the counsel's position upon the point, is considered in the light of the other decisions in that State, directly against it. In *Sibley* v. *Quinsigamond National Bank*, 133 Mass. 515, it is shown that Judge Shaw's decisions in *Fisher* v. *Essex Bank* was controlled by the statutes of that State expressly applicable to bank shares. Judge Allen, who delivered the opinion of the court in *Sibley* v. *Quinsigamond*, at page 521, says: "In *Fisher* v. *Essex Bank* the question was, what was the intention of the legislature of this State in using similar words (referring to the provision in the federal banking act, that the stock shall be transferable on the books of the bank in such a manner as may be prescribed by its by-laws), and the court found in the general spirit and scope of the legislation of this commonwealth, as to the attachment of shares in corporations, and in the particular legislation as to the attachment of bank shares, evidence that the legislature intended by the words 'the stock of said bank shall be transferable only at its banking-house, and on its books,' to enact that an assignment not so recorded should not be valid against attaching creditors of the assignor . . . . ." Those statutes not only made the shares of any stockholder liable to attachment, but made it the duty of the officers of any corporation keeping its records to give a certificate of the shares or interest of any stockholder, on request of any officer having a writ of attachment or execution against such stockholder. "But," he says, "the statute under consideration for construction is a statute of the United States, in whose legislation no such policy existed, and whose legislative acts contained no provisions such as were referred to from the legislation of Massachusetts." And in *Boston Music Hall* v. *Cory*, 129 Mass. 436, 437, Judge Colt, in delivering the opinion

of the court, says: "In the next place it is strenuously urged that, by force of the various statutes of this commonwealth relating to the ownership and transfer of stock in corporations, authorizing the attachment of shares, requiring returns to the secretary of the commonwealth, and imposing a personal liability on stockholders for the debts of the corporation, there can be no transfer of stock, valid against the claims of an attaching creditor, unless such transfer be recorded in the books of the corporation, citing the statutes. The intent of the legislature, it is said, must have been to provide for the owners of stock a convenient and uniform method of transferring title on the books of the corporation, which should be the only valid transfer as to creditors and others interested; and although the statutes have not provided in express terms that, as to creditors, transfers shall not be valid until they are so recorded, yet such, it is contended, is the necessary implication, for otherwise, the design of the statutes requiring registration and making the shares liable to be taken for debts would be defeated. But the consideration is not sufficient to control the law as long since settled by the decisions of this court. It requires clear provisions of the charter itself, or of some statute, to take from the owner of such property the right to transfer it in accordance with known rules of the common law. And by those rules, the delivery of a stock certificate, with a written transfer of the same to a *bona fide* purchaser, is a sufficient delivery to transfer the title as against a subsequent attaching creditor." Citing several cases, including *Fisher* v. *Essex Bank*, the learned judge further adds, that "it would not be in accordance with sound rules of construction to infer from the provisions of several different statutes, passed for the purpose of obtaining information needed to secure the taxation of such property, or for the purpose of subjecting stockholders to a liability for the debts of a corporation, or for protecting the corporation itself in its dealings with its own stockholders, that the legislature intended thereby to take from the stockholder his power to transfer his stock in any recognized and lawful mode. If a change in the mode of transfer be desirable for the protection of creditors, or for any other

reason, it is for the legislature to make it by clear provisions, enacted for that purpose."

It is evident from these cases that Judge Shaw, in the absence of the peculiar provisions of the Massachusetts statutes referred to, would have held the direct opposite of the holding set out in the petition. That under the statutes of this State upon the subject, it may reasonably be supposed he would have decided the same way the court did in *Boston Music Hall* v. *Cory, supra;* such has been the current of decisions in the federal courts, and I am of the opinion that in the best considered cases the same result has been reached. In support of that opinion I cite, with great confidence, *Smith* v. *Crescent City etc. Co.* 30 La. An. 1378, and *Cormick* v. *Richards,* 3 Lea (Tenn.) 1. Judge Davis, in *Bank* v. *Lanier,* 11 Wall. 377, 378, stated explicitly what kind of security Reed had when Seeley deposited said certificates of stock with him, when he said that, "although neither in form nor character negotiable paper, they approximate to it as nearly as practicable. If we assume that the certificates in question are not different from those in general use by corporations, and the assumption is a safe one, it is easy to see why investments of this character are sought after and relied upon. No better form could be adopted to assure the purchaser that he can buy with safety. He is told, under the seal of the corporation, that the shareholder is entitled to so much stock, which can be transferred on the books of the corporation, in person or by attorney, when the certificates are surrendered, but not otherwise. This is a notification to all persons interested to know, that whoever in good faith buys the stock, and produces to the corporation the certificates, regularly assigned, with power to transfer, is entitled to have the stock transferred to him. And the notification goes further, for it assures the holder that the corporation will not transfer the stock to any one not in possession of the certificates. In this state of the case, Lanier and Handy made their purchase of Culver. They bought for value, without knowledge of any adverse claim, in full faith that the bank would observe its engagements, and pursued in all respects the directions given in the certificates. They were not

told to give notice to the bank of their purchase, nor was there
any necessity for notice, because, by the rules of the bank,
Culver could not transfer the stock in the absence of the certifi-
cates, and these they had in their possession." Reed being a
pledgee instead of a purchaser of the stock did not render it
more necessary that it should be registered in his name in order
that his rights in the transaction should be protected. Holding
the certificate without such registry would be more consistent
and less liable to the imputation of fraud, in the case of a pledge
than of a sale. But I am satisfied that in neither case could his
rights be affected by any act done or suffered by Seeley subse-
quent to the delivery over to him of the stock, although no trans-
fer was made upon the books of the company. Reed cannot,
therefore, claim that it was necessary to his protection against
the creditors of Seeley, or against the acts of Seeley himself in
selling the stock to, a purchaser without notice, that such trans-
fer be made. The former had a right to have a transfer made
upon the books of the company, but it seems to me that it was
only a conditional right, that the parties did not intend that it
should be exercised except in event of the non-payment of the
note. They seem to have acted in accordance with such inten-
tion. Reed did not have the transfer made for more than a
year and a half after the execution of the assignment, and in the
mean time Seeley voted the stock. The transfer upon the books
would put it out of the power of the latter to receive the
dividends that might accrue thereon, and at the same time he
had obligated himself to pay the interest upon the note semi-
annually, at the rate of seven per cent per annum. I can see no
justice in the right which Mr. Reed sets up. Counsel have
cited a number of authorities to show that he had a right, as
pledgee of the stock, to fill the blank in the assignment and
have it transferred to himself. I have examined the most of
these authorities, and do not think them decisive of the question
under consideration, or as having much to do with it. *Day* v.
*Holmes*, 103 Mass. 310, one of the cases cited, was an action for
the wrongful conversion of certain mining stock, delivered by
the defendant to the plaintiffs as collateral security for his

XV. OR.—9.

indebtedness to them, with an assignment in blank, which the plaintiffs filled by inserting their own names, and obtained new certificates to be issued to themselves. This, the court said, was in no sense a sale of the stock to themselves; that the delivery of the assignment in blank necessarily implied the right to insert their own names, and the doing so, and taking out new certificates, was in accordance with the implied contract of the parties, and a lawful and reasonable measure to protect their security, and could, upon no principle, be deemed an unlawful conversion. The gist of the decision is, that the plaintiffs were not chargeable with a wrongful conversion of the stock in consequence of the filling the blank assignment and having the new certificates issued to themselves; that it was in accordance with the implied contract of the parties. It will be observed that the court also said in that case, "that it was obviously not the intention of the plaintiffs to exercise any dominion over the stock inconsistent with the rights of the defendant," that "his rights were not in fact violated or injuriously affected."

If it had appeared to the court that the plaintiffs were largely interested in the corporation that issued said stock, that their apparent object and purpose in filling the blank assignments with their own names, and having the new certificates issued to themselves, was to enable them to represent the stock at stockholders' meetings, vote it in opposition to the wishes of the defendant, and in order to secure the election of themselves and friends to the directorship of the corporation, and thereby control the management of their affairs, it would not certainly have commended the act, nor, in my opinion, have determined that they could rightfully use the defendant's stock to further any such design. *McNeil* v. *Tenth National Bank,* 46 N. Y. 330, another of the cases cited by counsel, was an action to compel the surrender of 134 shares of stock in the First National Bank of St. Johnsville. The plaintiff owned the stock, and delivered it to, and left it with Goodyear Bros. and Durant, stockbrokers, as collateral security for any balances that might be found due them on account of other stock they had purchased and were carrying for him. A blank assignment and power of

attorney to transfer the 134 shares was indorsed thereon, and signed by the plaintiff at the time of its delivery. Afterwards the defendant, at the request of Goodyear Bros. and Durant, paid to Fred. Butterfield, Jacobs & Co. the sum of $45,135, and received from the former certain securities, including the 134 shares of stock as security, for the advances. Goodyear Bros. and Durant, at the time of the advances to Fred. Butterfield, Jacobs & Co., were insolvent and indebted to the defendant. In pledging the plaintiff's shares of stock, they acted without actual authority from him, and without his knowledge. He was indebted to them in the sum of $3,000, but the account had not been rendered, or any demand made; the defendant, at the time of receiving the shares, had no knowledge of the plaintiff's interest therein. The defendant filled in the blank of the assignment and power with the name "I. H. Stout" its cashier, and attempted to have the shares transferred to his name on the books of the said First National Bank of St. Johnsville, but was prevented by injunction in the action. The balance of the advances made thereon by the defendant, less the proceeds of the other securities received therewith, was $15,219.81, and the question for the court to determine was whether defendant was entitled to hold the 134 shares for the payment of this balance. The court of appeals held that it was; that the plaintiff by executing the blank assignment and power was, as against the defendant, estopped from asserting his ownership to the stock where the latter had made advances under the circumstances mentioned; that the signing of the blank assignment and power, and delivering the stock, was the common practice of passing the title of stock, and that it conferred upon Goodyear Bros. and Durant the apparent title thereto. The question was not as to the rights of the immediate parties to the assignment and power of attorney, but as to the rights of third persons who had advanced money upon the faith of them. If Reed had sold the 361 shares in controversy to an innocent purchaser, there is no doubt but that such purchaser would have acquired a valid title to them. But a pledgee of the stock, as between himself and the pledgor, would have no such right. Chancellor Wal-

worth, in *Commercial Bank of Buffalo* v. *Kortright*, 22 Wend. 347, used the following language: "The stock was not sold to Bartow, but was merely pledged for the security of $10,000. He therefore had no legal right to fill up the blank with an absolute sale to himself, and a power to transfer it on the books of the bank absolutely. If the debt was not paid, he had a right to sell the pledge to a third person, after due notice thereof to Barker, and then have been authorized to fill up the blank with an absolute sale to such purchaser, and a power to transfer the stock to such purchaser on the corporation books, as that would be according to the agreement inferred from the pledge of the certificate with such blank indorsement." In that case the rights of a *bona fide* transferee were involved, who had sued the bank for refusing to permit a transfer of the stock upon its books, and the decision was placed on similar grounds to that in *McNeil* v. *Tenth National Bank, supra;* but the view enunciated by the chancellor upon the point referred to was not questioned as a logical sequence, and there is nothing, as I can see, in the way of its application to the case under consideration. The question here is between pledgor and pledgee. The obligations of each are fully set out in a written agreement.

The object of the formal assignment and power of attorney relating to the shares of stock was evidently to effectuate and carry out the purposes of the agreement; and the evident and unmistakable aim of the relator was to gain control and dominion over the shares of stock pledged, in order to enable him to retain the management of the affairs of the company, and without regard to the maintenance and protection of his security. That he had a right to have the shares transferred upon the books of the corporation, for the better protection of his security; except as before suggested, is very questionable to my mind; but that he had such right for the purposes of advancing his general interest, I do not believe; cannot think that the transaction between him and Seeley, in view of all the facts, indicates any such intention on the part of the parties, and I must still adhere to my former bluntly-expressed opinion upon that point. I do not mean to be understood as holding that a pledgee of capital

stock in a corporation has not a right to have it transferred to him upon the books of the corporation. Many authorities, in referring to the matter in a general way, accord the right unqualifiedly, and I have met with others that deny it. In *Smith* v. *Crescent City etc. Co.* 30 La. An. *supra*, the court at page 1383, in referring to the convenience and value of such stock as a basis of credit, says: "The holder who does not wish to sell may pledge his certificates for loans and discounts to an amount approximating their market value, with reasonable margin for possible depreciation. The pledgee does not desire to become the owner of the stock; and he would not think it necessary, *nor would he have the right to surrender the pledged certificates, and have the stock transferred to him on the books of the corporation.*" The court here evidently meant that such right did not arise out of the mere act of pledging, and I think that would be correct except where the transfer was necessary to the completion of the pledge. A pledgee cannot be the purchaser of the thing pledged, when sold to satisfy the debt (*Bryon* v. *Baldwin,* 52 N. Y. 232), and he could certainly have no right to have a transfer made to himself upon the books of the corporation, unless specially granted by the pledgor; pledging the shares of stock would not of itself confer the right. *McHenry* v. *Jewett,* 33 N. Y. Sup. Ct. 453, is decisive of that point. In that case shares of the capital stock of the Cleveland, Columbus, Cincinnati, and Indianapolis Railway Company were pledged by the plaintiff, their owner, to the Erie Railway Company, to secure a loan of money, and by means of certain foreclosure proceedings against that company they were transferred, subject to the plaintiff's right of redemption, to the New York, Lake Erie, and Western Railroad Company. The sale under this foreclosure was made in 1878, and since that time the defendant had held the shares nominally as trustee for the last-named company. By what authority they were registered in his name as trustee had not been made to appear. It was not shown to have been done under the authority of the plaintiff in the action. "For that reason," the court said, "the defendant must be regarded as holding the shares solely under the authority created by the

pledge, and having no greater right to make use of, or act upon them, than the relation of a mere pledge would confer. As between himself and the plaintiff in the action, that continued to be the sole measure of his rights. As the defendant had the shares simply by way of pledge or security for the repayment of money which had been loaned upon them, he could hold them only for that purpose, as long as the rights of the plaintiff to redeem them by the payment of the debt was not extinguished by a lawful sale." (*Lawrence* v. *Maxwell*, 53 N. Y. 19.) "They are articles of property which under such an arrangement could not be otherwise lawfully used, and, under the authorities, the defendant had no legal right to vote upon them without the express or implied assent of the plaintiff, the pledgor. This point was considered in *Scofield* v. *Union Bank*, 2 Cranch C. C. 115; *Vowell* v. *Thompson*, 3 Cranch C. C. 428; *Ex parte Wilcocks*, 7 Cowen, 402. In the last case it was held that, until the pledge was enforced and the title made absolute in the pledgee, and the name was changed on the books, the pledgor should be received to vote; that it was a question between him and the pledgee with which the corporation had nothing to do." (*Ex parte Wilcocks*, 7 Cowen, 411.) "These cases are direct and decided authorities against the right of the defendant to vote upon the shares, and the principle sustained by them has in no respect been impaired by the *Matter of Baker*, 6 Wend. 509, or the *Mohawk and Hudson Railroad Company*, 19 Wend. 135, for the disputes which were then made the subject of adjudication did not arise between parties sustaining the relation existing between the plaintiff and the defendant to this action. It was simply made a question between a person offering to vote, who was registered as trustee of the shares in the first case, and described as cashier in the second, and the corporation, whether such registry of stock authorized the person in whose name it had been made to vote upon it. No point was made in behalf of the party beneficially interested in the shares, and for that reason, the cases are inapplicable to the present controversy; for here it has been shown that the defendant, in whose name the shares had been registered as trustee, has no greater or other

right than that of a pledgee, which under the authorities determining the effect of that relation, will not permit him to vote upon them against the objection of the plaintiff, who is still to that extent entitled to dictate and direct the use which may be made of them."

The opinion of the court in the case from which this rather extensive quotation is made was delivered by Judge Daniels, who, for nearly twenty-five years past, has been upon the bench of the Supreme Court and court of appeals of New York, and whose knowledge of the various decisions of the courts of that State, and ability to discriminate between analogous ones, is not excelled by any jurist. Said opinion was concurred in by Judges Davis and Brady, the former of whom delivered the opinion in the *New York and New Haven Railroad Company* v. *Schuyler*, 34 N. Y. 41, to which the counsel have referred in their petition apparently with great confidence. A distinction is made in *McHenry* v. *Jewett*, which, in the examination of the question under consideration, is liable to be overlooked, and that is the difference in principle between a case where parties claim a right to represent stock and it is challenged by the corporation, and one where the contention is between parties beneficially interested in stock, as to which is entitled to represent it.

The corporation might not have any right to refuse to allow a party to be registered as a stockholder in the company, and to participate in the affairs of its business, while another party might very properly object to it as the exercise of unwarranted authority and a fraud upon his legal rights. A corporation is no such sacred sanctuary as is able to shield those gaining admission to it from the responsibility imposed by law. Getting shares of stock transferred to a person upon the books of the corporation does not preclude the courts from inquiring, when the matter is properly before them, by what right the transfer was made, and what immunities it confers. The records of corporation proceedings are not absolute verity, or conclusive of the right of parties under the law. They may show that a person is a stockholder in the company and entitled to vote shares of stock, when the courts, upon an investigation of the facts, would adjudge the

contrary. The question as to who has the right to vote shares of stock must ultimately be determined by law, and as between pledgor and pledgee, it has been long since established that the right belongs to the former unless accorded by him to the latter. A stipulation to that effect upon the part of the latter, or from which it would necessarily be implied, would doubtless confer the right; but as said in *McHenry* v. *Jewett,* it is a question between the two parties with which the corporation has nothing to do.

*Qualification of director.* Upon the question whether an assignee of a share of stock is a stockholder in the company so as to be eligible to the office of director before a transfer of the stock is made upon the books of the company, I can see no reason to change my former view. The language of Rapallo, J., in *Neil* v. *Tenth National Bank,* quoted by the learned counsel for the petitioner, "that as between the parties, the delivery of the certificate, with assignment and power indorsed, passes the entire title, legal and equitable, in shares, etc., and that the transferee acquires the entire right to the stock, subject only to such liens or claims as the corporation may have upon it, and excepting the right to vote at elections," etc., is more in favor of that view than against it.

If it were a case where the legislature had provided that the stock should be transferable only on the books of the company, the position contended for by the counsel might be tenable; but where that is only required as a compliance with the by-laws of the company, to facilitate the management of its affairs, I cannot think it is. It seems to me that a sale of a share of stock to a party, evidenced by a written transfer and delivery of the certificate, constitutes him, under the laws of this State, a stockholder within the meaning of the statute, providing that no person is eligible to the office of director unless he is a stockholder in the corporation. Who could be the stockholder in such case except the purchaser of the share? Certainly not the seller, after having sold it, received the purchase price therefor, delivered over the certificate with a written assignment indorsed thereon, and done every act in his power to render the sale complete, although

his name still remained upon the books of the company as owner. It might, with full as much reason, be claimed that the grantor of real property continued the owner of the fee until the grantee recorded his deed from the former. The grantor, in fact, has power over real property after executing the deed in such a case, which the vendor of stock does not possess over a share so transferred. The former by again selling the real property to an innocent purchaser might cut off the right conveyed to his first grantee, while the vendor of the stock, after delivering over the certificate with the assignment indorsed, would be wholly powerless to affect his first vendee by a second sale. The books of the corporation are evidence as to who are the holders of the stock; but not conclusive evidence upon that point. The law must ultimately determine the question from all the facts in the case. It would be carrying the doctrine of nicety to an absurd extent, to hold that a party, although he had sold out his entire stock in a corporation, or where it had been sold out upon a lawful execution against him, would still have the right, if the transfer had not been made upon the books of the company, to manage its most important affairs in defiance of the real substantial owner of the stock. Yet it seems to me that the rule contended for by the counsel, if carried out to its logical sequence, would necessarily, under certain conditions that might arise, lead to such results.

LORD, C. J., dissenting. — The memorandum, it is agreed, establishes the relation of pledgor and pledgee. The inquiry then presented is twofold, viz.: 1st, Whether a pledgee to whom is assigned a certificate of shares of stock of a corporation as collateral security for a promissory note, executed by the pledgor with an irrevocable power of attorney, authorizing such pledgee to transfer such shares to his own name on the books of the company, may, in pursuance of such power or contract, have such transfer made, and a new certificate issued to himself before default and sale; and 2d, whether, after such transfer and issuance of a new certificate, but while such debt or promissory note remains unpaid, the pledgee may, as an incident of such

pledge or contract, vote such shares of stock. Upon the first point the case of *Rich* v. *Boyce*, 39 Md. 314, is decisive. The facts were these: Boyce loaned Rich a sum of money for which he took his note, and also a certificate of stock as a pledge to secure his loan. The face of the certificate declared that it "was transferable only in person or by attorney on the books of the corporation on return of this certificate." On it was indorsed a power of attorney executed by Rich, authorizing Boyce to have the stock transferred to his own name on the books of the corporation. Boyce, two days after the loan and before the maturity of the note, surrendered the certificate to the company, and a new certificate was issued to him in his own name. The note falling due, Boyce sued Rich on it.

The court say: "The sixth exception was taken to the ruling of the court below, refusing to permit the appellant to offer evidence of the market value of the pledged stock at the time it was pledged. This proof was offered upon the theory that the appellant, by delivering up to the railroad company the certificate of stock No. 727, and taking a certificate of the same number of shares of the same stock in his own name, had thereby converted the certificate No. 727, and the stock it represented, to his own use. By the power of attorney on the back of the certificate, which is proved to have been executed by the appellant, the appellant was authorized to have the stock transferred to his own name upon the books of the company; and the certificate shows upon its face that this could be done in no other way than by returning the certificate to the company and having another issued to himself. The evidence offered in this exception was therefore clearly inadmissible. The seventh exception is to the refusal of the court to permit evidence to be offered to show that the appellant had never, at any time or in any manner, authorized the appellee to surrender the stock pledged, or to have it re-issued to the appellee in his own name. As we have shown in considering the preceding exception, that such authority was given by the power of attorney indorsed on the back of the certificate, the proof offered was properly rejected. The eighth exception was taken to the rejection of proof of usage or

custom in Baltimore City among brokers, that a pledgee has no right to surrender to the company issuing it the stock pledged, and have 're-issues in his own name; but that the pledgee must retain the same as pledged until default, and if no default takes place, to return the identical stock pledged to the pledgee.   The contract between the parties expressly conferred authority upon the appellee to have the stock transferred to his own name, and as that contract is perfectly plain and unambiguous in its language and terms, no evidence of usage or custom was admissible to explain or control it.   The ninth exception was taken to the refusal of the court to permit evidence to be given that the appellee had neither made a demand for the payment of the note, nor offered to return the stock he pledged.   The appellee was not bound to make any demand for payment of the money due upon the note, the suit itself being all the demand which the law required.   Nor was he obliged to tender a return of the pledge.   His contract gave him the right to hold the pledge until the note was paid.   All that was required of the appellee was to have the stock ready to be returned on the payment of the money, to secure which the pledge was given.   The evidence offered was therefore properly rejected."   And the court further say in respect to certain prayers: "So far from the transfer of stock to the appellee's own name being a wrongful conversion, it was the mere exercise of an undoubted right conferred upon him by the appellant.   Without such right, the pledge would have been doubtful security, as the stock would have been liable to execution or attachment by any creditor of the appellant."

Now, what are the facts in the present case?   Seeley assigned and delivered to Reed a certificate of 361 shares of the capital stock of the corporation, as collateral security for the payment of a note of $50,000 given to him by Seeley, and at the same time executed an irrevocable power of attorney authorizing Reed to transfer said shares to his own name on the books of the corporation.   Before the note became due, Reed caused the stock to be transferred to his name upon the books of the corporation. Manifestly, he had the right to do this, as it was in conformity with the plain terms of the contract, and in pursuance of the

right conferred upon him by Seeley. Nor is such transfer to his own name inconsistent with the legal relation of the parties, but necessary to render the pledgee's security available, and to protect it from attachment or execution of the creditors, if any, of Seeley, the pledgor.

" The delivery of certificates of stock," says Mr. Colebrooke, "as collateral security, with a power of attorney to transfer them to another person, confers a power coupled with an interest, and gives to any one claiming under an execution of the power a right to demand of the bank a new certificate of stock. The power thus given can only be revoked by payment of the debt for which the stock has been transferred as collateral security." (Colebrooke on Collateral Securities, § 272.)  " Where," said Okey, J., "as in this case, the pledgor executes an irrevocable power of attorney, authorizing a transfer of such shares on the books of the bank issuing the same, the pledgee has a right to demand such transfer to be made." (*Dayton National Bank* v. *Merchants' National Bank*, 37 Ohio St. 215. See, also, *Dickinson* v. *Central National Bank*, 129 Mass. 279; *Gill* v. *Continental Gas Co.* Law R. 7 Ex. 322.) Reed, therefore, exercised an undoubted right conferred upon him by Seeley under the plain terms of the contract, when he procured the transfer of the shares to his own name on the books of the corporation. Subsequently, in July, 1886, and while the debt or note still remained unpaid, a meeting of the stockholders was convened and these shares appeared on the books of the company in Reed's name. Mr. Seeley attempted to vote these shares, but his vote was rejected. Had Reed a right to vote these shares pledged to him and standing in his name on the books of the company?   " A person in whose name the stock of the corporation stands is, as to the corporation, a stockholder, and has the rights to vote upon the stock, . . . . nor would this result follow any the less certainly if the shares of stock were received in pledge only to secure the payment of a debt, providing the shares were transferred on the books of the company to the name of the pledgee." (Boynton, J., in *Franklin Bank* v. *Commercial Bank*, 36 Ohio St. 355.)  " In the absence of restrictive statutes," says Mr. Colebrooke, "the pledgee of

certificates of stock, indorsed and transferred on the books of the company, has a right to vote at its meetings. His name appearing as stockholder upon the records of the corporation, he becomes for all purposes a stockholder. *The right to vote is an incident of the pledge, and according to the presumed intentions of the parties.* Where such stock remains in the name of the pledgor on the books of the company, the right to vote remains with him." (Colebrooke on Collateral Securities, § 283, and notes 2, 3, in which numerous authorities are cited.) Now Reed had put his name on the books of the corporation by force of the authority conferred on him by the power of attorney executed by Seeley; that power being coupled with an interest remained irrevocable until the note was paid, for which the shares of stock were transferred as collateral security. As Seeley had not paid the note the power was unrevoked, and the right of Reed to appear upon the books of the corporation as transferee of the shares was intact and according to the terms of the contract. His name thus appearing on the books of the corporation, Reed became liable to the responsibilities and entitled to the privileges of a stockholder, among which is the right to vote. As Seeley had clothed him with the power to assume such duties, responsibilities, and privileges, what right has he to complain while his note remains unpaid and the power unrevoked? When he shall have relieved himself from his default by the payment of his note he will then be entitled to a return of his collateral, or what is the same thing, a transfer of the stock, whereby he may again appear upon the records of the corporation as a stockholder, and entitled to enjoy his privileges as such.