ARTHUR MEIGS AND RICHARD G. PETERS v. JAMES R. DIBBLE.

*Fraudulent conveyances—Husband and wife—Fraud—Purchase of homestead.*

1. A deed of land to a wife in payment of a debt owing to her by her husband is not a voluntary conveyance, nor fraudulent with respect to his other creditors.

2. We know of no rule of law in this State that prevents a person, whose indebtedness may be equal to or in excess of his resources, from using a portion of his property to purchase a homestead. Such action is not a fraud upon creditors, nor a concealment of his property, which is placed in a shape where it will be the subject of beneficial provision for himself and his family, which action the law recognizes and allows; and such property, having all the requisites of a homestead as to ownership, value, and occupancy, will be held exempt from levy and sale on execution by his creditors.

3. Where a merchant obtains goods on credit with the intention of at once placing them beyond the reach of his creditors by exchanging his *whole* stock for a homestead, the proceeding is evidence of a fraudulent intent in the purchase of the goods at the outset, and the case falls within the ruling in *Pratt v. Burr,* 5 Biss. 36, which is thus distinguished from the case at bar.

Appeal from Allegan. (Arnold, J.) * Submitted on briefs October 26, 1888. Decided November 28, 1888.

Bill in aid of execution. Complainants appeal. Decree dismissing bill affirmed. The facts are stated in the opinion.

*Godwin, Adsit & Dunham,* for complainants, contended:

1. If the owner of a homestead, in order to defraud his creditors, conveys it to another, with a secret reservation in favor of himself or some member of his family, neither he, nor they in case of his death, can claim another homestead, nor an allow-

ance in lieu thereof, out of the body of his estate not embraced in such conveyance; citing *Luther v. Drake*, 21 Iowa, 92; *Currier v. Sutherland*, 54 N. H. 475; and this is but another application of the obvious rule that, as to creditors, no single debtor, nor any single family of a debtor, can hold two homesteads; citing *Tourville v. Pierson*, 39 Ill. 446; *Horn v. Tufts*, 39 N. H. 483; *Davis v. Kelley*, 14 Iowa, 526; *Wright v. Dunning*, 46 Ill. 271; *Jarvais v. Moe*, 38 Wis. 440.

2. When defendant took from his store property not paid for, and which his creditors were entitled to have applied in payment of their debts, to get another homestead in lieu of the one conveyed to his wife, and of one which they were then in the enjoyment of, it became in legal effect a fraudulent conveyance as to creditors, and as to them must be held void; citing *State v. Devereux*, 41 Tex. 283.

3. The mere fact that the title to the Burnip's Corners property has been in defendant's wife since January, 1886, does not destroy its homestead character, and property, the title to which was in the wife, has been sustained as the homestead of the husband and family; citing *Edmonson v. Meacham*, 50 Miss. 34; *Orr v. Shraft*, 22 Mich. 261; and where property has been conveyed jointly to the husband and wife, this Court has held it to be subject to the homestead rights of the husband and of the family; citing *Lozo v. Sutherland*, 38 Id. 168.

4. As to when a homestead may be claimed, counsel cited *Murphy v. Crouch*, 24 Wis. 365; *McKee v. Wilcox*, 11 Mich. 358; *McClary v. Bixby*, 36 Vt. 257; *Thorn v. Thorn*, 14 Iowa, 49; *Vinton v. Beamer*, 55 Mich. 559.

*Pope & Hart*, for defendant, contended for the doctrine laid down in the opinion.

LONG, J.    The bill in this cause was filed September 5, 1887, in aid of an execution levied upon the N. W. ¼ of S. E. ¼ of section 16, township 4 N., range 14 W., Allegan county, on June 30, 1887, which execution was issued upon a judgment in favor of complainants, and against defendant, in the circuit court for Allegan county, on June 14, 1887, for the sum of about $426.    The testimony was taken in open court, and on the hearing the court below dismissed the bill.    Complainants appeal.

The claim made by complainants' counsel, in their

brief, is that at the time of the rendition of said judgment, and for some time previous thereto, complainants were and had been wholesale grocers in the city of Grand Rapids, and had from time to time, up to August 18, 1886, sold and delivered goods to defendant, for a portion of which he was then indebted to complainants in the sum of $426, the amount of the judgment aforesaid; that previous to January 1, 1886, and up to the 3d of said month, defendant had been and was engaged with his brother, at Burnip's Corners, in said county of Allegan, in a general mercantile business, when their stock of merchandise and the store building were consumed by fire; that the stock was insured for about $6,000, and the building for $1,200; that at the time of this fire, and for five years before, the store building and ground on which it stood had belonged to and the title was in defendant.

On January 8, 1886, defendant deeded this property to his wife. The value of said property at that time, with the store building burned, was at least $1,000; and soon after this conveyance to defendant's wife defendant began the erection of a store building, hall, and dwelling-house thereon, all of which was done with defendant's money, and was completed ready for occupancy in April following. These buildings cost from $800 to $1,200. On April 17 following defendant placed a general stock of merchandise in said building, and again resumed his mercantile pursuits, but entirely in his own name, with a stock of about $6,000 or $7,000, all of which was purchased by defendant upon credit, and largely upon credit of four months. The stock remained at about this value until in August, when it was increased to $8,000 or $8,500, for all of which the defendant was indebted, on August 28, a portion of it having been purchased of complainants, defendant having ordered two bills of groceries from complainants on August 18.

On August 28 defendant entered into an agreement to purchase, from Messrs. Pope & Hart, the 40 acres of land in question, and to give to them a mortgage upon said stock of goods for $2,000 as security for that much of the purchase price of said land. The deed and mortgage were drawn on that day, but, the wife of one of the grantors being away from home, the deed was sent to her for execution, and upon its return it was sent to the defendant, he executing the mortgage as contemplated, and on the next day defendant delivered the chattel mortgage to the township clerk for filing, and on the same day moved on to the 40 acres of land, claiming it as a homestead, and asserting that on that account it was exempt from the payment of his debts. Within three days after the Pope & Hart mortgage was filed there were nine other mortgages given upon this stock, and filed in the town clerk's office, aggregating $8,770.66, and within the same time the store was closed by the creditors.

On September 14 complainants took a mortgage upon said stock for a portion of their claim, but soon thereafter learned that it was valueless, as the stock before that had been mortgaged for more than it was worth. The stock was sold upon the Olney, Shields & Co. mortgage, and from the proceeds the $2,000 mortgage to Pope & Hart was paid, and the entire stock exhausted, without leaving any amount to pay complainants' claim.

To recover the amount of their claim complainants, on November 22, 1886, began suit by attachment in the circuit court for Allegan county against defendant, and on the same day levied their attachment upon said 40 acres of land. The cause proceeded to judgment, and on June 30, 1887, the execution was levied upon said land.

The bill of complaint is drawn upon the theory, and it is substantially alleged therein, that said 40 acres of land

was purchased with said stock of goods, a portion of which was purchased from complainants on credit.

That at the time of such purchase the defendant's business was merchandising exclusively; that his store and house were erected upon property conveyed by him to his wife, and that the same was his homestead, although the title was in his wife; that defendant was not a farmer, and was not and is not entitled to an exemption in the 40 acres of land, on account of the fraud practiced upon his creditors, and for the reason that the dwelling-house and store occupied by defendant was his homestead, and that the appropriation of $2,000 worth of the stock to the payment of said land was a fraud upon his creditors; that the complainants have the right to pursue into said lands the proceeds of said goods for the purpose of collecting their claim; that the deed to defendant's wife of January 8, 1886, the building of the house and store on said land, the purchasing, in April, of a large stock of goods entirely on credit, the agreement with Pope & Hart, of August 28, 1886, to purchase said land and mortgage said stock, the delivery of the deed and mortgage of September 9, the defendant's change of residence to the said 40 acres of land immediately thereafter, were all transactions in a common scheme of the defendant to fraudulently and dishonestly obtain said 40 acres of land with property of his creditors.

The bill prays a decree declaring said 40 acres of land subject to sale under complainants' execution for the payment of such claim, and that the defendant be precluded from claiming any homestead rights in such premises.

The defendant, by his answer, admits the judgment, and the issuance and levy of the execution. The answer denies that the goods were all purchased on credit, and that his purchases from complainants, or from any other

creditor, were procured through any false and fraudulent representations, or that he ever made any false statements or representations for the purpose of obtaining credit. The answer admits the purchase of the 40 acres of land, and the giving of the $2,000 chattel mortgage on the stock to secure the payment of the purchase money, but denies that any of the goods purchased of the complainant were in the store at the time of the giving of the chattel mortgage. The answer further alleges that he purchased said 40 acres of land in good faith, to be occupied by him and his family as his homestead, and that he was residing thereon when the attachment and execution were levied by complainants, and that he paid into the business carried on by him between $3,000 and $4,000 of his own money.

Defendant's counsel now claim that the proofs taken establish the facts that defendant's wife owned 80 acres of land in Salem, Allegan county, which was purchased with money received from her father's estate, and from a pension; that, in 1877, she and her husband moved upon this land, which was in a wild state, and resided thereon some two years, building upon it and improving it, when the wife raised $800 thereon by mortgage, and gave it to her husband, the defendant, to start in mercantile business at Burnip's Corners, with one I. W. Wells; that the firm of Dibble & Wells continued to do business for about six months, at which time the wife of defendant exchanged her interest in the farm for Mr. Wells' interest in the business, including the village lot and store building, valued at $1,200, all of which was paid for with the farm of defendant's wife, but that the defendant took the title to this real estate in his own name.

On January 3, 1886, the defendant having previously taken his brother, Austin Dibble, as a partner, the stock of merchandise owned by them, and the store building,

of which the title was then in defendant, was consumed
by fire.   The firm of Dibble Bros. had about $6,000 insur-
ance on the stock, and defendant $1,200 on the building.

On  January  8,  before  the  defendant  contemplated
rebuilding, he deeded the store lot to his wife, she hav-
ing furnished him the money for its purchase some six
years previously.

From  the  money received  from  the  firm's  insurance,
together with what accounts they were able to collect,
the firm of Dibble Bros. paid their creditors every dollar
they owed.   The defendant and his brother dissolved their
partnership at the date of the fire.

After all the firm debts of Dibble Bros. had been paid,
the defendant had in money and securities, upon which
he realized, during the summer of 1886, outside of the
money put into the new store building, $4,403.33, all of
which was put into his business prior to the 9th day of
September, 1886, except a small amount of uncollected
accounts.

Defendant claims that about March 1, 1886, some of
the customers and neighbors of defendant turned out,
donating their labor, and helped defendant rebuild the
store on this lot some three months previously conveyed
to his wife, the cost of which was from $800 to $850;
that defendant put in of his own means about $600, in
constructing this store building; that the balance was
donated.

· That as soon as defendant commenced rebuilding, trav-
eling men from wholesale houses from different parts of
the country came and solicited orders for goods; that on
April 6 defendant purchased the first bill of goods from
complainants, through their traveling man, amounting to
$13.42, and that his store had previously been furnished
with a stock of goods of $6,000, no part of which had
been purchased from complainants; that in no instance

did defendant apply to a house to purchase goods from April 17, when he started in business, to September 13, when defendant's creditors took possession of his stock, and that all of said stock was purchased from traveling salesmen.

Defendant opened his store April 17 with a stock of between $6,000 and $7,000, purchased in the usual way, on 30, 60, or 90 days', and 4 months' time. His sales during the summer of 1886 averaged about $125 per day, and some days as high as $400. Monthly sales averaged $3,000. This included sales from store and from two wagons kept on the road during the summer. There was an average of $1,000 in money paid for goods per month, besides the butter and eggs brought in by wagons, which were 60 per cent. of the sales, which were shipped to creditors, and credited on merchandise account, and was in addition to cash paid to customers. Defendant did not keep his own books, but was out of doors most of the time with the teams, and no stock or merchandise account was kept. On August 28, when he first thought seriously about purchasing the land in question, he had no actual knowledge of his financial condition; nor did he or his book-keeper know the amount of his indebtedness.

The inventory of the stock by one of the mortgagees, large parts of which were estimated, and others taken, much below cost, amounted to about $8,000, outside of accounts. The stock was worth, at its cost price, $12,000. The mortgages ahead of complainants amounted to $7,028.44.

Complainants were not present to look over the stock after taking their mortgage, nor were they present at the sale to protect their claim.

While the bill of complaint in this case proceeds upon the theory that the defendant, by false and fraudulent representations made at the time of the purchase, obtained

the goods of complainants and from other dealers, the proofs do not sustain this allegation. All the goods of complainants were purchased through their traveling salesmen, and from the testimony of defendant, which is wholly uncontradicted, many times the salesmen urged the defendant to purchase, and no showing is made that any representations whatever were made by the defendant as to his financial standing.

This claim is not now insisted upon in the brief of complainants' counsel. It is insisted, however, by complainants' counsel, that, if the conveyance by defendant to his wife of the property at Burnip's Corners, and his subsequent expenditures of money thereon, were intended to place his property beyond the reach of his creditors, and part of the same scheme which resulted in the purchase of the 40 acres of land, then the court in equity should determine that the property at Burnip's Corners was and is the homestead of defendant under the rule as claimed by complainants' counsel, that, if the owner of a homestead, in order to defraud his creditors, conveys it to another, with a secret reservation in favor of himself or some member of his family, neither he, nor they in the event of his death, can claim another homestead, or any allowance in lieu thereof, out of the *corpus* of his estate not embraced in such conveyance. But the difficulty of complainants' position is that the proofs show a valuable consideration paid by the wife for this property.

Defendant was called as a witness by complainants, and upon his examination gave testimony showing that the wife owned 80 acres of land in her own right, paid for from moneys received from the estate of her father, and some pension moneys; that, when defendant first went into business, she let him have $800, procured by her giving a mortgage upon this 80 acres of land; that sub-

sequently she made an exchange of this land for the property at Burnip's Corners and a half interest in the merchantile business. The title to this land was taken in the husband. He placed upon it $1,200 insurance, and, when the buildings burned, collected it. After the buildings burned off, he deeded the property to his wife, and, as he says, in payment of what he owed her. This testimony is not disputed. Some time subsequent to the making of this deed buildings were erected upon the premises, and the parties went there to live.

It is too well settled to need discussion that a conveyance to a wife in payment of a debt owing to her by her husband is not a voluntary conveyance, nor fraudulent with respect to his other creditors. *Gibson v. Bennett,* 79 Me. 302 (9 Atl. Rep. 727); *Heath v. Slocum,* 115 Penn. St. 549 (9 Atl. Rep. 259); *Lyon v. Zimmer,* 30 Fed. Rep. 401, and note; *Dice v. Irvin,* 110 Ind. 561 (11 N. E. Rep. 488); *Bank v. Weber,* 72 Iowa, 137 (33 N. W. Rep. 606); *German American Seminary v. Saenger,* 66 Mich. 249 (33 N. W. Rep. 301); *Brickley v. Walker,* 68 Wis. 563 (32 N. W. Rep. 773); *Dull v. Merrill,* 69 Mich. 49 (36 N. W. Rep. 677).

The claim, also made by complainants' counsel, that the moving by the defendant into the house on the premises so deeded to his wife was evidence of a homestead selection by him, has no force. The title had been conveyed to her by an absolute deed, and for a valuable consideration. She had an absolute right, under the married woman's statute, to sell, transfer, mortgage, convey, devise, or bequeath it the same as if she were unmarried, and it could not be made liable for the debts, obligations, and engagements of her husband. How. Stat. §§ 6295–6297. Under the evidence in this case the transfer of this property to Mrs. Dibble cannot be considered as evidence of fraud, or as in any way affecting

the validity of the purchase of the 40 acres of land in controversy.

Complainants' counsel contend, however, that, if it should be found that the Burnip's Corners property was not defendant's homestead, still they are entitled to make the amount of their claim out of the 40 acres of land, because, as they claim, it was acquired through fraud of defendant upon his creditors. To sustain this position complainants' counsel cite *Pratt v. Burr*, 5 Biss. 36, and claim that the case is exactly in point. In that case it appears that the defendants were merchants in possession of a stock of goods, and in that character, and under those circumstances, replenished their stock by the purchase of goods of the plaintiff upon credit. After acquiring possession of the goods so purchased, they transferred their whole stock in fraud of their creditors, and took in exchange therefor these premises, which they claimed as a homestead. The court, in that case, said:

"The mere statement of the facts decides the case in the conscience of every honest man. The defendants cannot expect the court to assist them in consummating the intended fraud."

In the present case the defendant had a stock of goods which was inventoried at $8,000, and which, defendant alleges, was worth $12,000. These goods were free and unincumbered. So far as the record discloses the defendant had good credit, but was not versed in book-keeping, and did not know the extent of his indebtedness. He purchased the 40 acres of land, giving security upon the stock for the purchase price, $2,000, and at once secured two of his creditors by mortgages upon the land purchased, and the other creditors by chattel mortgages upon the stock. Only a small portion, if any, of the complainants' goods were in stock at the time of the giving of the $2,000 mortgage to Pope & Hart. The complainants had

no specific interest in the goods, and no lien upon them. The general ownership was in the defendant.. He had a. right to sell and dispose of them, or to incumber them for any honest purpose. If they had been levied upon by execution, he would have had the right, under the circumstances here shown, there being no fraud in their purchase, to have claimed his exemption out of them, and to have selected such goods as he pleased from the inventory, though they might have been the very goods. he purchased from these complainants. He could sell or exchange them for goods, clothing, or necessaries for his family, and thus place that portion of them beyond the reach of his creditors. If they had been sold and converted into money, he could expend $1,500 of the money so obtained in the purchase of a homestead, for himself and family, and no one would contend, under the circumstances here shown, that a creditor could attack the homestead right thus obtained, or pursue the goods. through such a sale, and the moneys obtained therefor, into the homestead, for the purpose of collecting a claim for the goods sold. While he had the goods they could be subjected to the payment of his debts. Having changed them into a homestead, under the circumstances here shown, the law protects it for himself and family from seizure and sale on execution.

This is a very different case from one where the party obtains property on credit with the intention at once to place it beyond the reach of creditors by exchange of the whole for a homestead. Such a proceeding would be evidence of a fraudulent intent in the purchase of the property at the outset, and the case would fall within the ruling of the court in *Pratt v. Burr, supra.* Here there is no testimony showing, or tending to show, that the defendant fraudulently obtained the goods in question, or made any misstatements to obtain the credit given him

in their purchase. He was pursuing a legitimate and lawful trade, purchasing goods on time, as other merchants the country over purchase, and it appears the complainants' traveling agent sought him out, and urged goods upon him. He had invested some three or four thousand dollars in the venture himself.

The Constitution and laws of this State exempt certain property as a homestead. The laws have always been most liberally and beneficially construed in favor of the family, and we know of no rule of law in this State that deprives a person, whose indebtedness may be equal to or exceeds his resources, from taking a part of his property to purchase a homestead. This is not a fraud upon creditors. It is not a concealment of his property. He merely puts the property into a shape in which it will be the subject of beneficial provision for himself and his family, which the law recognizes and allows, and, such property having all the requisites of a homestead as to ownership, value, and occupancy, it will be held exempt from levy and sale on execution by his creditors. *Tucker v. Drake*, 11 Allen, 145; *O'Donnell v. Segar*, 25 Mich. 377; Thomp. Homest. & Ex. §§ 307-309.[1]

The defendant was in possession of this 40 acres of land, claiming it as a homestead, at the time of the levy of the writ of attachment and of the execution by the complainants. It is not claimed by the bill or by the proofs taken that defendant's interest therein exceeds the $1,500 homestead exemption allowed by the Constitution and statutes of this State.

The complainants' bill was properly dismissed in the court below, and that decree must be affirmed, with costs.

The other Justices concurred.

---

[1] Cited by defendant's counsel in support of the proposition stated.
73 MICH.—8.