The National LaFayette Bank et al v. George E. Scott et al.·

1. A suit by creditors of an insolvent firm to set aside a transfer made by one of the partners to his wife can not be maintained, where the petition makes no reference to prior efforts to realize upon the debt out of the partnership property, and does not allege solvency or any other fact, justifying proceedings directly against the individual property of one of the partners.

2. Partnership obligations are of a joint nature, and the taking of a judgment against one of the joint obligors operates as a discharge of the others from liability; and this is true where the debt is an unquestioned partnership liability, notwithstanding it is evidenced by the individual notes of the partners.

3. Technical responsibility of a partner for disaster to a solvent business will not be accepted as indicating a fraudulent purpose on the part of such partner in transferring his property while the business was still solvent.

Hosea, J.

The suit is brought by creditors of the late firm of George Scott's Sons, to set aside a transfer of the family

residence property of George E. Scott, made by him to his wife on July 7, 1900, as being in fraud of the rights of creditors; and to subject said property to their claims.

The bank sues upon a debt of about $6,000, based upon notes signed by individual partners—George E. and Samuel J. Scott—to and endorsed by the firm. It is pleaded as, and in fact is, a partnership debt; as are the claims of the Winifrede Coal Company and the Eagle White Lead Company, who are joined in the suit. The only right of action against George Scott individually, therefore, is based upon the legal liability of a partner for the firm debt.

Certain questions, therefore, suggest themselves at the outset as preliminary to the consideration of the question of fraudulency in the transfer of the property by Scott to his wife.

The petition makes no reference to any prior efforts to realize the debt out of the partnership property; nor does it allege insolvency, or any other fact that might serve to explain the omission and justify a proceeding directly against the individual property of George E. Scott as a partner; nor does it state any other fact or reason for ignoring the rule requiring a firm creditor to first exhaust the partnership assets. The present suit asks the aid of a court of equity in what is properly a supplementary proceeding against the individual partner to enforce the collection of a debt against a firm.

It is well settled that equity will not lend its aid to subject the estate of one partner to a judgment against a firm while the joint property is not exhausted; still less will it do so where it does not affirmatively appear that the proper legal steps have been taken and have failed to secure payment of the debt, or that some impediment or good reason exists for not taking such steps.

The partnership property is the proper fund for the payment of partnership debts, and must be resorted to before the separate property of partners can be reached through the agency of a court of chancery. 3 Ohio, p. 287, *Hubbell* v. *Perrine;* Lindley on Partnership, *p. 744, et alia.

What is said above applies equally to all the creditors who appear in the suit. There is another objection which applies only to the claim of the National LaFayette Bank.

It appears in testimony that the bank previously brought a suit in this court against the partnership and the individual partners, upon the identical claim presented here; and that in said suit it took a personal judgment against Samuel J. Scott, a partner, for the entire sum; that an execution was ordered, and that an order was also entered directing the sheriff to hold a certain fund in his hands, belonging to said Samuel J. Scott, subject to the order of the court in the case referred to; and this seems to be all that has been done so far.

These facts bring into operation another well-established rule of law, namely, that where a joint obligation is sued upon and a judgment taken against one of the joint obligors, such judgment operates to discharge the others from liability. This is so for the reason that the parties are bound, in law, in respect of one and the same debt; and if judgment is entered upon the debt, the claim is merged in the higher security of the judgment.

Partnership obligations are of this joint nature, and fall within this rule. Lindley on Partnership, *191-2, p. 255; Shumaker on Partnership, 342.

This principle was accepted and applied in 18 O., 307, *Sloo* v. *Lea,* and has been recognized in subsequent cases, to-wit: 20 O., 344-351; *Reynolds* v. *Stansbury et al;* 5 O. S., 34, *Clinton Bank* v. *Hart;* 35 O. S., 270, *Avery* v. *Van Sikle;* 42 O. S., 11, *Yoho* v. *McGovern.*

The facts that the notes constituting this debt sued upon by the bank were signed by the individual partners, makes no difference. Equity looks through the form of transactions to the substance. Not only is the debt sued upon here as a whole and as a partnership debt, but, in the other suit, circumstances are pleaded showing that the money was borrowed expressly for firm uses—the transaction being put in the form of individual notes for firm purposes. And it is also clear, from the testimony in this case of the bank president, Mr. Goodman, that the

credit was given to the firm as such, and not to the individual partners.

This debt, upon such a state of fact, is unquestionably a partnership liability and subject to all the limitations governing such liability, notwithstanding it stands upon the individual notes of partners. 33 O. S., 7, *McRee* v. *Hamilton;* 4 C. C., 195, *Merchants Bank* v. *Little;* 8 C. C., 532, *First National Bank* v. *Stiles.*

Under the operation of these established principles, the plaintiffs and cross-petitioners have not shown their right to maintain this suit or to have granted to them the relief sought; but in justice to all parties, I have carefully considered the main question upon a wholly independent basis, and will state my conclusions and the reasons therefor.

The law of England, whence we derive our statutes relating to conveyances in fraud of creditors, has always been severe and strictly administered. It is quite within the memory of some yet living that the principle of imprisonment for inability to pay a debt—a principle whose evils were so forcibly exposed by Dickens' touching story of Little Dorrit—has been laid aside in English jurisprudence as obsolete, in recognition of the higher considerations of the public good, excepting only where by actual and intentional fraud, a man has forfeited his right to consideration under more beneficent modern statutes and adjudications.

But even under the English decisions of a quite recent period, much of the old spirit of harshness prevails; and, influenced by these decisions, our own courts, in some instances, have felt constrained to apply rules which probably would not obtain to-day upon the same state of fact. Without dwelling further here upon the more lenient—or, at least, more discriminating—attitude of modern courts of equity (which will be found very fairly stated in Vol. 14, Am. & Eng. Encyc. of Law, p. 304), I will call attention to a few considerations that are controlling factors in their examination.

The statute upon which this suit proceeds is Section 6343 of the Revised Statutes, as amended April 26, 1898;

and relates to a conveyance or transfer made in contemplation of insolvency, or with intent to prefer one or more creditors to the exclusion of others, or with intent to hinder, delay or defraud creditors, etc.

It is an elementary principle that fraud or fraudulent intent will not be presumed. It must be pleaded and proved as a fact. But in cases of fraudulent conveyance an intent may be held to exist by force of circumstances, where perhaps no conscious purpose existed, under the rule that a man must be held to intend the natural and inevitable consequences of his acts.

Again, insolvency, in these cases, is frequently to be judged of by the after event; and, usually, if it takes place shortly after the making of the conveyance, it is, under the English authorities, sufficient proof of fraudulent intent at the time. American authorities, however, recognize an exception where a man is perfectly solvent at the time of the transfer, but is afterwards rendered insolvent through unexpected losses which could not have been reasonably reckoned on at the time of the conveyance. Bump on Fraudulent Conveyances, Section 254; 1 Bailey, 575.

And, indeed, the fair and just rule, as it seems to me, is that the inquiry should be limited to the circumstances of the grantor at the time. (Bump on Fraudulent Conveyances, Sections 263-265.) And this I understand to be the rule in Ohio. 15 O., 108, *Miller* v. *Wilson.*

Conveyances of this nature are frequently, however, voluntary conveyances; those made without a valuable consideration; such, for example, as a gift to a wife or child in consideration of love and affection; and, naturally, in such cases a more careful scrutiny of the facts and perhaps a somewhat more exacting enforcement of the rule is demanded. This is illustrated in the case of *Miller* v. *Wilson, supra,* where the court say (p. 114):

"It is claimed by the complainants that a voluntary conveyance, for the consideration of natural love and affection, can not be sustained, if, at the time, the grantor is involved in debt. Decisions to this effect have unques-

tionably been made in England, and probably such is the law in that country. And such seems to have been the decision of Chancellor Kent, in a case decided by him in the state of New York, 3 Johns. Ch., 481. We do not, however, conceive this to be the correct rule as generally established in this country. A man may make an advancement to his child, although at the time in debt, provided he has sufficient property remaining to satisfy such subsisting debts. And if the advancement is made under such circumstances, it can not be impeached by subsequent creditors, merely because it is voluntary. A person claiming under such advancement must be prepared, however, clearly and conclusively to show that there was other property sufficient to pay all subsisting debts."

See also 5 O. S., 121; 23 O. St., 493; 52 N. Y., Superior Court, 394.

Similar views are expressed in 2 O. S., 374, *Crumpacker* v. *Kugler*. And this is but an application of the principle that a man should be just before he is generous.

But there is another class of cases which do not call for the application of these stricter principles, namely: conveyances made in personal good faith to a wife upon the consideration of advances previously made to the husband, or by way of mortgage to secure a *bona fide* indebtedness to her.

In 3 N. P., 311, *German Nat. Bank* v. *Gunther,* a wife's advances, with interest, were protected as a lien; and in 40 O. S., 287, a mortgage given to secure a *bona fide* indebtedness to a wife was held good,—in both cases against the claims of creditors. And this rule is generally recognized. 102 N. C., 413; 78 Ala., 555; 136 Ind., 319; 84 Iowa, 598; 183 Penn., 219; 73 Mich., 101; 60 Bul., 316; 71 Ind., 459.

And the homestead allowance of $500 may be allowed out of the proceeds, even if the conveyance is set aside. 5 O., 293; 34 O. S., 645; 41 O. S., 206.

And the wife's dower is also protected. Waite on Fraud. Cov., Section 315; 108 U. S., 66; 130 Mass., 407.

Coming now to the consideration of the actual circum-

stances attending the transfer here in question, the following seem to me the decisive facts upon the testimony adduced.

The firm of George Scott & Sons, upon the death of the elder Scott in about 1888, was succeeded by the firm of George Scott's Sons, in which a son-in-law, Waite, became a one-fourth partner. The business of a pottery had been long and successfully carried on by the elder Scott; and, upon his death, the real estate of the plant was inherited by the two sons, George E. and Samuel J. Scott, and a daughter, Mrs. Waite (in thirds). The business was large, and its capital ample and its credit good. The brother-in-law, Waite, appears to have been a disturbing factor; and soon after the date of the transfer in question, suits were brought, one by Waite to dissolve the partnership and settle its indebtedness, and the other by the Scotts to partition the real estate.

In the former suit, in July, 1900, it appeared from the books, when receivers took charge, that the assets were $59,215.17 and the liabilities $18,874.33; and George E. Scott is credited with $14,804.17 capital, with a personal credit of $1,818.38, making $16,623.35. An inventory and statement of assets and liabilities was made in September by direction of the receivers, and showed assets of $43,000, and liabilities of $18,864.13; and net capital to the credit of George E. Scott of $8,723; and this is the only tangible evidence of the actual condition up to that time.

These suits were amicable in the sense of being intended by the parties to settle their own affairs and enable them to rearrange the business upon a basis more satisfactory and harmonious as between themselves, and manifestly with no thought of wrong to creditors.

This, then, must be accepted as the condition of affairs at the time of the conveyance in dispute; and, even supposing that the intention to file these two suits existed at that time, there was then no insolvency.

The lot in dispute was bought by George Scott in 1889 from personal accumulations; and, as the building of the house progressed in the same year, the wife contributed

from money of her own—largely received from her mother—about $2,000 to $2,500, as testified by husband and wife.    Upon cross-examination—and as requested by plaintiff's attorney—the wife brought into court a personal memorandum book showing entries as follows:   At various dates in 1889, $830 paid to the carpenter; $75 to the stonemason; $370 to blank; $330 to the carpenter; and $150 for mantels, making a total of $1,755; and in 1896, $150 for a furnace, making a grand total of $1,905; and testified, in corroboration of more general statements of the husband, that these were paid for and during the construction of the house.

The husband further testified that he always regarded the house as hers, and that the yearly taxes on the same had been paid by her.

A rough calculation will show that the advances of 1889 at 6 per cent. swelled in 1900 to $2,910.30, and that of 1896 to $186; making a total of $3,096.30, taking no account of the taxes, which are not detailed in the evidence. This is something more than a mere unsecured indebtedness of a wife that would place her on a par with other creditors.    It was money advanced on the faith of the property itself, actual purchase money advanced under circumstances and upon such an understanding as gave her a lien in equity, at least to the extent of her advances with interest, and, in fact, made the husband her trustee of the title for her benefit.

Now in the suit of the Apollo Building Association to foreclose a mortgage made in 1900, the property was appraised at $3,000, which is the only evidence of value of the property at a point of time near the date of the transfer.

Upon this state of facts, it being conceded that there was in the transfer no fraud actually intended, the contention of the plaintiffs must fail, unless the subsequent events prove that the favorable conditions thus shown by the testimony to exist at the time of the transfer were apparent, and not real; and that creditors were in fact actually defrauded.

The facts thus urged are:

(1) That it appears by a statement of the expert accountants, in the partnership suit, that for some years prior to 1900 the profit and loss account showed a preponderance of loss in a large sum. But this raises no inference of insolvency against the inventory of tangible assets in 1900 of $43,000, with a total indebtedness of much less than one-half that amount, about $18,800.

(2) That upon the receiver's sale of the partnership assets about a year and a half later, after an unsuccessful effort of the receivers to run the business, they sold the machinery for $3,100, about one-tenth of the appraisement, and the total assets for but little over this amount, something over $5,000 in all.

Mr. Scott testifies to the ignorance, improvidence and wastefulness of the receivers' management, and the injury to and deterioration of the machinery in their charge, as accounting for this discrepancy. But this is not a sufficient explanation.

The real explanation, apparently, is the divided ownership of the pottery real estate and buildings, and its machinery and apparatus equipment, two necessary parts of a valuable property considered as a whole, each useless and comparatively worthless when separated.

It is, perhaps, not the province of the court to comment on the apparent absence of good judgment manifested in the proceedings which led to such disastrous results, by those directly concerned in them; but it is fairly pertinent in the present connection to say that it is surprising that the creditors, who must have known of these proceedings, should have stood by and made no effort to secure their claims by preventing the sacrifice, at least upon the theory that the pottery property, as a whole, including the real estate, which had been so long used in the business, and formed the basis of its credit, was partnership property and subject to payment of their debts, under well-established doctrines.

But I do not see in this ultimately disastrous result any such connection with the conditions existing in July, 1900,

as that such results could have reasonably been antici-pated by George E. Scott, or any man of ordinary busi-ness prudence. Even considering that he is technically responsible for the disaster, as a party in interest with those whose foolish acts precipitated the catastrophe, still it can not be said that it indicates any fraudulent purpose. The case of Samson may be a precedent or showing that a man may intentionally pull down a temple on himself that others may be injured; but it is beyond reason that a man would pull down the temple of his own fortunes to defraud an ordinary creditor. Therefore, I do not see that these subsequent facts alter the evident situation attending Scott's transfer to his wife in July, 1900.

Upon all the testimony in the case, and upon the law as clearly applicable thereto, I am constrained to hold that the equities of the case are with the defendants, George Scott and Sophia Scott, and judgment is rendered ac-cordingly.

I am satisfied that the mortgage of the Apollo Building Association was made and taken in good faith, and that it should not be disturbed, as the law provides.

*Maxwell & Ramsey, Dempsey & Fridman* and *Kelley & Follett,* for plaintiffs.

*J. H. Charles Smith,* for defendants.